**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Lead Plaintiffs

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Mark Allen and Salvatore Ruppa, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PIXARBIO CORPORATION f/k/a BMP HOLDINGS INC., and FRANCIS M. REYNOLDS,<br><br>Defendants. | **Case No:** 2:17-cv-00496-CCC-SCM<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead plaintiffs Mark Allen and Salvatore Ruppa and named plaintiffs Marvin Becker and Jacqueline Becker ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PixarBio Corporation ("PixarBio" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the

Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the securities of PixarBio: (1) pursuant and/or traceable to the Company's private placement that closed on October 30, 2016 (the "Private Placement"); and/or (2) publicly traded on the open market between October 31, 2016 and January 23, 2017, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. PixarBio investors have become pawns in a war between Defendant Francis M. Reynolds ("Reynolds"), the Company's chairman, Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO") and Chief Scientific Officer, and InVivo Therapeutics Corporation ("InVivo"), a company that he founded in 2005 and that forced him out in 2013 after discovering that he had committed misconduct.

3. During the Class Period, Reynolds made false claims about PixarBio's operations and business plans in order to raise money from investors interested in financing research and development. He then used those funds not to develop technology, but to finance his battles with InVivo over his ouster and the ownership of intellectual property rights for technology developed while he led that company.

4. On January 3, 2017, PixarBio made what appeared to be an unserious offer to acquire InVivo for $77 million in stock – half of InVivo's market value at the time. In a series of

press releases, Reynolds attempted to publicly litigate his intellectual property disputes with his former company, while InVivo largely ignored his accusations.

5. Then, on January 23, 2017, the SEC halted trading in the securities of PixarBio, citing concerns about possible "manipulative or deceptive activities" in the market for the Company's stock. While Reynolds abandoned the bid to acquire InVivo that day, it was too late for the Company's shareholders. On January 3, 2017, PixarBio's stock closed at 4.18 per share; Even after the SEC's January 23, 2017 suspension of trading expired on February 3, 2017, PixarBio's stock has consistently remained valued below $1 per share. Most recently, on February 12, 2018, PixarBio received a letter notifying them that SEC staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company.

**JURISDICTION AND VENUE**

6. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

8. Venue is proper in this district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business and the Company maintains an office in this district.

9. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10. Plaintiffs, as set forth in the accompanying Certification, purchased PixarBio securities at artificially inflated prices during the Class Period and/or pursuant and/or traceable to the Private Placement, and were damaged by Defendants' violation of the securities laws.

11. Defendant PixarBio is a specialty pharmaceutical/biotechnology company that claims to focus on the pre-clinical and clinical development of neurological drug delivery systems for post-operative pain. The Company is incorporated in Delaware and its principal executive offices are located at 8B Industrial Way, Salem, New Hampshire 03079. The Company also maintains offices at 2200 Fletcher Avenue, Suite 301, Fort Lee, NJ 07024. On October 31, 2016, PixarBio began publicly trading its stock on the OTC Markets under the stock symbol "PXRB." On November 8, 2016, PixarBio began trading its stock on the OTCQB Marketplace under the stock symbol "PXRB." On November 28, 2016, PixarBio began trading its stock on the OTCQX Marketplace under the stock symbol "PXRB."

12. Defendant Reynolds co-founded the predecessor corporation to what is now PixarBio in 2013. He is the Chairman, CEO, CFO, and Chief Scientific Officer of PixarBio.

13. Defendant Reynolds is sometimes referred to herein as the "Individual Defendant."

14. The Individual Defendant:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

15. The Company is liable for the acts of the Individual Defendant and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16. The scienter of the Individual Defendant and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17. The Company and the Individual Defendant are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18. Defendant Reynolds co-founded InVivo in 2005, with proprietary technology developed by Robert S. Langer ("Langer"), a professor at the Massachusetts Institute of Technology. InVivo, which went public in 2010, focused (and continues to focus) on the treatment of spinal cord injuries. Until August 2013, Reynolds was InVivo's Chairman, Chief Executive Officer, Chief Financial Officer, and President.

19. On August 22, 2013, InVivo announced that Reynolds had resigned from the company, effective immediately. At the time, Reynolds was a significant shareholder in InVivo.

According to InVivo's Schedule 14A filed with the SEC on April 19, 2013, as of March 31, 2013, Reynolds held 21.5% of the company's outstanding common stock.

20. InVivo originally stated that Reynolds resigned due to a medical condition. The truth quickly proved to be quite different. In fact, InVivo's board of directors was investigating whether Reynolds had abused his position and misused corporate funds. The InVivo board of directors had convened a special meeting to consider whether Reynolds should be terminated before he resigned. In November 2013, InVivo sued Reynolds, claiming that between March 2011 and August 2013, he inappropriately charged over $500,000 of personal, exorbitant, and unreasonable expenses to the company. The lawsuit alleged breaches of fiduciary duties, breach of contract, conversion, misappropriation of corporate assets, unjust enrichment, and corporate waste. InVivo attached to its complaint a list of expenses that Reynolds charged to the company that included multiple personal vacations for himself, his girlfriends, and relatives, charges to his personal residential account at the Ritz Carlton in Boston, extensive entertainment expenses that had no business purpose, and personal goods. Reynolds soon filed counterclaims against InVivo alleging breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference with a contract.

21. Reynolds began selling off his InVivo stock daily. He accelerated these dispositions in August 2014, selling as many as 77,777 shares of InVivo stock each day and creating strong downward pressure on InVivo's stock, which gradually dropped from $37.44 as of the first trading day of January 2014 to a then-all-time low of $8.04 on September 5, 2014.

22. Immediately after being forced out of InVivo, Reynolds founded PixarBio Corporation as a privately held Nevada corporation ("PixarBio Nevada"). According to a November 17, 2013 press release, PixarBio Nevada's founders included Reynolds, Langer, Randy

Holmes-Farley, and Katrin Holzhaus. PixarBio Nevada planned to "research and develop novel biomaterials for long term-personalized drug delivery systems for Parkinson's Disease." On December 13, 2013, PixarBio Nevada announced that it had signed a five-year lease for a corporate headquarters and research and development facility in Medford, Massachusetts. PixarBio Nevada began describing Dr. Jason Criscione ("Criscione"), a biomedical engineer with experience in immunotherapy drug delivery and materials science who joined PixarBio Nevada in March 2014, as an additional co-founder of the company in approximately May 2015.

23. Reynolds continued carrying on a contentious relationship with InVivo as he was establishing PixarBio Nevada, including recruiting an InVivo employee to provide proprietary information to his new venture. Yajing Hernandez ("Hernandez"), a research associate for InVivo, left her job there on September 18, 2014. Following Hernandez's last day of work, InVivo examined her laptop and allegedly discovered that she had transferred a significant volume of proprietary research materials to her personal email account. InVivo later learned that PixarBio Nevada allegedly lured Hernandez away with a $10,000 pay raise and stock options, and filed a complaint against her, PixarBio Nevada, and Reynolds.

24. According to its public statements, in 2015, PixarBio Nevada shifted its focus to non-opiate pain treatment.

25. On January 18, 2015, PixarBio Nevada entered into a consulting agreement with Langer, under which he received options to purchase 413,200 shares of PixarBio Nevada common stock at an exercise price of $.005 per share. There is no evidence, however, that Langer was meaningfully involved in any research and development work being carried out at PixarBio Nevada. David Kaplan ("Kaplan"), PixarBio's former chief commercial officer, later told a member of the Company's clinical advisory committee (Confidential Witness 1, or "CW1") that

he himself had been misled about Langer's involvement. Kaplan told CW1 in a text message on January 13, 2017 that "I would not have invested had I known Langer's association was basically non-existent…That along with naming him a co-founder lent tremendous credibility to Frank and that's confusing to everyone. I never once saw or had a conversation with Langer. I'm furious he gets an annual salary and was given 15% of the company. It was HIGHLY misleading."

26. On June 25, 2015, PixarBio Nevada announced in a press release that Criscione had been promoted to be the company's Chief Technology Officer. In the same release, Criscione stated that PixarBio Nevada had "engineered several post-op/nerve block products while preparing for clinical studies expanding our non-opiate pain treatment pipeline."

27. From November 5, 2015 through December 4, 2015, PixarBio Nevada raised $718,000 from the sales of 1,107,009 shares of common stock at $0.649 per share, sold primarily to Reynolds.

28. In December 2015, PixarBio Nevada commenced a private offering of common stock at $1.45 per share sold to accredited investors. As of June 30, 2016, PixarBio Nevada had raised $5,398,980 and issued 3,718,130 shares of common stock related to this private offering, and closed the offering.

29. On October 26, 2015, PixarBio Nevada announced that it had filed an application with the U.S. Food and Drug Administration ("FDA") Office of Orphan Products Development, for orphan drug status of its NeuroRelease TN (NR-TN) drug candidate for the treatment of Trigeminal Neuralgia (TN).

30. On March 18, 2016, PixarBio Nevada announced that it had filed an application with the U.S. FDA Office of Orphan Products Development, for orphan drug status of its NeuroRelease SCI (NR-SCI), a novel drug candidate for the treatment of Spinal Cord Injury (SCI).

31. As of June 30, 2016, PixarBio Nevada had an accumulated deficit of $14,610,582.

32. On July 22, 2016, Reynolds intensified his litigation against InVivo. He filed a lawsuit in New Hampshire against InVivo and certain members of its board alleging defamation, conspiracy, and tortious interference. Reynolds alleged that the InVivo defendants defamed Reynolds' reputation in the biotechnology and investment community, interfering with prospective investors in PixarBio Nevada.

33. Almost immediately after filing this lawsuit, Reynolds began to take steps towards taking PixarBio Nevada public. On August 19, 2016, PixarBio Nevada purchased 96.7% of the stock of BMP Holdings Inc. ("BMP"), a Delaware corporation with a public listing on the OTC Markets exchange which operated a yoga business. The purchased stock was previously held by Henry Sargent ("Sargent"), who had been BMP's CEO, president, and sole director. As consideration, PixarBio Nevada paid Sargent $108,500 for his stock and made a capital contribution to BMP in the amount of $216,500, which was used to satisfy a personal loan that Sargent had made to BMP and to cover some remaining corporate expenses. As a result of this transaction, PixarBio Nevada became the majority shareholder of BMP, and Reynolds replaced Sargent as BMP's sole director. Effective September 28, 2016, BMP changed the trading symbol for its common stock on the OTC Markets from BMPP to PXRB.

34. Also in August 2016, PixarBio Nevada commenced the Private Placement of up to 20,000,000 shares at the price of $2.00 per share. Each share purchased received a warrant to purchase one share of common stock at an exercise price of $4.50 per share. The Private Placement terminated on October 30, 2016 and raised $7,186,094. A total of 3,593,047 warrants were issued to the investors.

35. In August 2016, PixarBio Nevada also amended the consulting agreement with Langer. Pursuant to an August 17, 2016 amendment to his consulting agreement, Langer would be entitled to receive annual compensation of $200,000 beginning October 31, 2016, the effective date of the merger between BMP and PixarBio Nevada.

36. As of September 30, 2016, PixarBio Nevada had accumulated a $19,125,883 deficit.

37. On October 11, 2016, Reynolds, as the sole director of BMP, carried out a stock split, approving a stock dividend of nine shares of BMP common stock for each share issued and outstanding. This increased the number of BMP's issued and outstanding common stock to 51,680,000 from 5,168,000, with approximately 49,974,560 shares held by PixarBio Nevada.

38. On October 13, 2016, BMP formed PixarBio Acquisition Corp. ("PixarBio Acquisition"), a wholly-owned subsidiary incorporated in Nevada.

39. On October 28, 2016, BMP entered into an Agreement and Plan of Merger (the "Merger Agreement") with PixarBio Nevada and PixarBio Acquisition. Under the terms of the Merger Agreement, on October 31, 2016 – the day after PixarBio closed its private placement - on October 31, 2016, PixarBio Acquisition was merged with and into PixarBio Nevada, with PixarBio Nevada continuing as the surviving corporation. BMP then effected a parent/subsidiary short-form merger with PixarBio Nevada, with BMP as the surviving corporation. Subsequently, BMP changed its name to "PixarBio Corporation," ("PixarBio" or the Company"), effective with FINRA on November 1, 2016. The new PixarBio was, from its formation, listed on the OTC Markets exchange under the stock symbol "PXRB."

40. Immediately after the transaction, PixarBio's board of directors consisted of Reynolds, Katrin Holzhaus, David A. Cass, Derek S. Bridges, and Laura Barker Morse.

41. On October 31, 2016, PixarBio's stock opened trading at $3 per share. It closed at $4.77, and then quickly experienced large fluctuations. On November 1, 2016, the stock's value fluctuated between $5.50 and $15 per share. On November 2, 2016, it fluctuated between $11 and $30 per share, closing at $30. On November 3, 2016, it closed at $15 per share after fluctuating between $10 and $25.

42. On November 8, 2016, PixarBio began trading its stock on the OTCQB Marketplace under the stock symbol "PXRB." That day, the stock was valued at $14.25 per share.

43. On November 28, 2016, PixarBio began trading its stock on the OTCQX Marketplace under the stock symbol "PXRB." The stock opened at $7.99 per share and closed at $6.80 per share.

44. On November 25, 2016, PixarBio filed a Form S-1 Registration Statement registering its common stock for resale (the "Prospectus"), making available for resale up to 78,529,976 shares of its common stock and 4,001,767 shares of common stock issuable pursuant to warrants held by approximately 235 shareholders of record. The Prospectus, however, proved to be materially false. Rather than using the funds raised by going public to fund PixarBio's operations, Reynolds was about to use his newly-public company to attempt to destabilize InVivo.

**Materially False and Misleading Statements**

45. In an October 30, 2016 press release announcing the finalization of the reverse merger, the Company stated:

> PixarBio is a specialty pharmaceutical/biotechnology company focused on pre-clinical and commercial development of novel neurological drug delivery systems for post-operative pain. PixarBio researches and develops targeted delivery systems for drugs, cells, or biologics to treat pain, epilepsy, Parkinson's disease, and spinal cord injury. Our lead product platform, NeuroRelease™, has achieved sustained therapeutic release of non-

> opiate drugs for post-operative, acute and chronic pain in pre-clinical models.

46. This statement was false and misleading. By October 30, 2016, Defendants were not "focused on pre-clinical and commercial development" of any product. Rather, Reynolds was taking PixarBio public in order to raise capital to use in his war against InVivo.

47. On November 25, 2016, PixarBio filed a registration statement on Form S-1 with the SEC, in which it registered 78,529,976 shares of common stock and 4,001,767 shares of common stock underlying warrants.

48. The November 25, 2016 Prospectus was fundamentally dishonest about PixarBio's purpose and business model. The Prospectus stated that "Our business model entails testing and developing new pharmaceutical products and eventually bringing them to the marketplace." It further stated:

> Pursuant to our private placement offering which closed in October, 2016, we raised an aggregate of $7,186,094. In addition, on October 28, 2016, Mr. Francis M. Reynolds, our co-founder, Chief Executive Officer, Chief Financial Officer, Chief Scientific Officer and Chairman of the Board of Directors, has verbally agreed to provide a line of credit to us in the amount of $10,000,000 ***to fund our operations.*** We intend to enter into a written agreement shortly. In addition, we anticipate additional funds from the exercise of warrants issued in the most recent private placement offering. Although there can be no assurance when and if the warrants will be exercised, ***we believe such funds would provide us with sufficient capital to enable us to fund our operations into the first quarter of 2018.***

(Emphasis added.)

49. This statement was false and misleading. While Defendants led investors to believe that Company operations were based on research and development activities, by November 25, 2016, Reynolds was focused not on research and development at all. Rather, he was merely weeks away from attempting to use the newly-public PixarBio against InVivo.

**The Truth Partly Emerges While Defendants Continue to Lie**

50. According to a lawsuit filed by Mary Phelan, the Company's former controller, the SEC commenced an investigation of the Company shortly after it began trading publicly.

51. Despite the pending investigation, on January 3, 2017, Reynolds made his move against InVivo, demonstrating that he prioritized his vendetta against his former company over his responsibilities to PixarBio and its stockholders. In a press release riddled with punctuation errors, Defendants announced an alleged take-over bid to acquire InVivo for $77 million in stock – half of InVivo's market value.

52. On December 30, 2017, the prior trading day, PixarBio's stock had closed at $4.59 per share, making its 78,529,976 issued and outstanding shares worth a total $360 million. In other words, taking PixarBio public had enabled Reynolds to make this all-stock offer to purchase InVivo.

53. Defendants devoted much of the press release announcing PixarBio's bid for InVivo to criticizing InVivo's performance since Reynolds' departure:

> "It's been over 3.5 years since I resigned as CEO of InVivo Therapeutics Corporation, to found PixarBio Corporation (PXRB) in August 2013. It's clear that 2013-2017 have not been great years for the NVIV CEO & the NVIV Board of Directors. The round of recent MAJOR exits makes it a perfect time to keep the required exits for success going. It's time to focus on shareholder value, and REAL change at NVIV. I founded InVivo Therapeutics over 11 years ago but the last 3.5 years have been a black hole for investor's money, and the NVIV team has had a real dead spot in innovation failing in the area of shareholder value creation, so it's time for real Change", said PixarBio CEO Frank Reynolds.
>
> **NVIV Recent Exits in Q4 2016: Read the "Tea Leaves" of Change, Hopefully Not Finished…**
>
> - We've watched the NVIV legal team 2011-2016, Greenberg Traurig, replaced with Wilmer Hale…DONE

- Since 2013, we've observed two NVIV CFOs replaced…we should know their exit deals…DONE

- We've observed John McCarthy the Chairman of the Board of NVIV replaced…DONE

- We've observed NVIV CEOs, guide the stock back to nears its 2010 IPO price $4.00/share twice since 2013…He Should Be DONE

- We see Rich Roberts and Ken DiPietro still on the Board…value destroyers, whose own histories in our PXRB Board's opinion make them unfit for ANY public board so they must resign from the NVIV Board of Directors.

Will we see Dr Rich Roberts and Ken DiPietro resign next? NVIV shareholders must be dreaming as they read this thinking, a fresh start without Roberts and DiPietro…GRAND SLAM. LOVE THE NEW TEAM.

"We all know that NVIV current CEO Mark Perin's took his company before NVIV as CEO into bankruptcy, and Perin has had 3 years (maybe two years too long) that's enough time to succeed with a Frank Reynolds' Neuroscaffold technology so it's time for change. The CEO of NVIV needs to be replaced to have a shot at commercializing NVIVs true value, the NeuroScaffold for treating acute spinal cord injury invented by Frank Reynolds.", said PixarBio CEO Frank Reynolds

**NVIV MAJOR ISSUES**

- Terrible Stock Performance, Terrible CEO, and Terrible Board of Directors 2013-2017

- Without conducting an exit interview of NVIV Founder, NVIV primary NeuroScaffold inventor and patent holder Frank Reynolds, NVIV shareholders have struggled to maintain the $520,000,000 in value created by Frank Reynolds, and today at $136mm they are dreadfully overvalued.

- It took years for NVIV to notify Frank Reynolds of their patent assignment issue, and Frank Reynolds will not provide FREE patents to NVIV. That request was ridiculous.

- There's never been a bridge for NVIV shareholders to own the commercial rights to the original Neuroscaffold and Frank Reynolds and PXRB can provide that to NVIV shareholders.

- Merging PXRB and NVIV is the only pathway for NVIV shareholders to have commercial rights to all of Frank Reynolds Neuroscaffold patents, Pain, Epilepsy, and Parkinson's know-how which is a HUGE win for NVIV shareholders

- By combining the PXRB and NVIV patent portfolios under one roof, the world of Neuroscience will be changed forever with a steady stream of R&D portfolio growth 2017-2039 to replace addictive opiates treating post-surgical pain, with a wide range of acute and chronic pain treatments, to develop acute and chronic spinal cord injury treatments, and to develop epilepsy and Parkinson's disease treatments.

**NVIV Under Frank Reynolds' Inventions and Leadership 2005 -2013**

- NVIV Market Cap went from $00.00 in November 2005, to $520,000,000 in July 2013

- NVIV shares hit a high of $24.80/share (split-adjusted)

- NVIV had years of cash and equivalents when Frank Reynolds resigned

- Frank Reynolds conceived and patented The Neuroscaffold with his personal checks, lawyers and contracts

- Frank Reynolds invented a Thick R&D portfolio with 7 Products in the pipeline 2005 – 2013.

- Today Non-opiate pain replacements are the hottest space in medicine but NVIV missed it.

**NVIV After Frank Reynolds August 2013-2017**

- Stock Plummeted within 60 days of Frank's resignation, by Sept-Oct 2013, the Board and management of NVIV had one product in-process at the FDA, and the stock plummeted to near $4.00/sh. (split-adjusted), which was Frank Reynolds' NVIV 2010 IPO share price

- In August 2013, Frank Reynolds had two of his inventions in-process for US FDA approval, but the NVIV Board of independent Board members didn't know the R&D pipeline and killed off a thick R&D portfolio including novel, non-opiate pain treatments invented by Frank Reynolds.

- NVIV Missed the Non-opiate pain market

- On Dec 31, 2016 at $4.20 NVIV is back to near its 2010 IPO price of about $4.00 (split-adjusted) for the second time since 2010 after hitting $4.00 in 2013.

- The 2013 NVIV Board of Directors is being replaced, but not fast enough

**Is NVIV really worth $136,000,000?**

The PixarBio offering price for NVIV is discounted to $77,000,000, or a take-under price because NVIV has failed to protect the Neuroscaffold's value, and in 2017, it is now back to near Frank Reynolds' 2010 IPO price per share of $4.00 (split-adjusted).

NVIV is near the 2010 $4.00 IPO share price, for the second time in 3.5 years since Frank Reynolds resigned.

"It's time for me to take back the technology and re-value what I invented, and bring my neurological patent portfolio to market after merging PXRB with NVIV", said PixarBio CEO, CFO, and Chief Science Officer Frank Reynolds. WE GOT THIS!!

….

**Justification for NVIV Take-under at $77,000,000**

- NVIV lacks Frank Reynolds Patent rights to commercialize the NeuroScaffold, the probability of a deal is zero under current Board of Directors and CEO

- Frank Reynolds has rejected NVIV request to assign rights to Neuroscaffold patent

- NVIV never compensated Frank Reynolds with shares for his inventions, and NVIV expects the use of the Neuroscaffold patents for free, but there will be a cost, and that cost must be factored into the current NVIV valuation, setting the new valuation around $77,000,000

- Since Reynolds resigned in 2013, NVIV CEOs twice have managed the stock down to Frank Reynolds' 2010 IPO price, CEO Mark Perrin has got to resign

- NVIV needs a CFO: Reynolds was finalist for CFO of the Year 2013. The temporary CFO brought in Q4 2016, has no EXPERIENCE as a public CFO, she is an internal hire with no leverage against the Board or leverage on Wall Street, so current NVIV valuation is way too high

- NVIV is back to its IPO again, A CFO MUST HAVE some Wall street exposure, this is NO TIME for training wheels

- PixarBio Founder Frank Reynolds not only won "2013 Boston Business Journal Finalist for CFO of the Year" but Frank Reynolds won the 2013 and 2016 Boston Business Journal Best Company to Work"

- During his career, Frank Reynolds is the ONLY CEO/CFO in Early Stage Pharma to have never done a down-round.

- Frank Reynolds education at Univ Penn: Wharton School, Harvard Business School, MIT-School, St Joe's Haub School of Business, Chestnut Hill College, and Temple Univ: Fox School of Business have provided him decades of more Wall Street experience than the Jan 2017 NVIV temporary CFO

- Frank Reynolds means a new life for NVIV shareholders

[*Sic.*]

54. This announcement was false and misleading. PixarBio was not making a serious play for InVivo. This offer was intended solely to disrupt InVivo and attempt to publicly debate Reynolds' disputes with his former company.

55. InVivo quickly dismissed the offer as unserious, and disputed Defendants' statements about its intellectual property and patents. In a January 3, 2017 press release, InVivo stated:

> InVivo Therapeutics Corporation was not privy to the announcement made today and has not had any discussions with PixarBio Corporation nor any other party regarding this matter. Given that the nature of the offer is not credible, InVivo disclaims any obligation to make any additional public statements regarding this or similar proposed transactions from PixarBio.
>
> The PixarBio press release contained a number of unfounded statements that do not warrant a response. However, regarding the claims about patents and intellectual property, InVivo has an exclusive license in the field of spinal cord injury to all patents and patent applications in prosecution covering the Neuro-Spinal Scaffold™. Frank Reynolds is not an inventor on any of these

> patents or patent applications, so no assignment is required and none was requested.

56. Reynolds immediately fired back at InVivo's response. Defendants issued a press release that stated:

> [InVivo's] press release claims that, "InVivo has an exclusive license in the field of spinal cord injury to all patents and patent applications in prosecution covering the Neuro-Spinal Scaffold™. Frank Reynolds is not an inventor on any of these patents or patent applications, so no assignment is required and none was requested."
>
> **The InVivo response is a Legal Play on Trademarks; Real Life Has Witnesses**
>
> **Did InVivo Lose Records?**
>
> Frank Reynolds filed over 40 patents applications at InVivo Therapeutics, capturing the Neuroscaffold in legal documents.
>
> As the Founder of InVivo Therapeutics and the only employee of InVivo Therapeutics 2005-2008 he personally selected, hired, contracted, and paid with his own personal check to a few different patent law firms that filed his Neuroscaffold patents 2005-2008; and from Nov 2005 - August 2013 he was the ONLY scientist to attend every patent lawyer meeting for the InVivo NeuroScaffold. He was the only scientist in more than 80% of NeuroScaffold patents meetings from 2005-2013 totaling more than 200 NeuroScaffold patent meetings.
>
> Frank Reynolds stated, "Today I had over 20 former staff jump to my defense and I know I can find 100+ lawyers, employees, consultants, advisors, that all lived through my Neuroscaffold invention with me, as I hired them all along the way. InVivo must have lost years of records."
>
> **"Legal Play on words" or "Play on Trademarks" in the InVivo response**
>
> Reynolds stated. "I own the trademark for Neuroscaffold, and when NVIV learned of the USPTO ruling, they realized I would not sign over the trademarks so InVivo created a new trademark "Neuro-Spinal Scaffold" and that trademark was indeed created after I left InVivo so I didn't invent anything under that moniker or the trademark "Neuro-Spinal Scaffold" but I certainly invented the

NeuroScaffold for spinal cord injury at InVivo Therapeutics 2005-20013 about a decade before InVivo even thought up the moniker or trademark "Neuro-Spinal Scaffold". The new mgmt. team should have conducted an exit interview with me in 2013".

If InVivo doesn't have any record of my inventorship 2005-2013, they are worse off than anyone can imagine, because we had less than 8 employees until 2010 so who can they claim invented it? I spent 110 hours per week from 2005-2013 inventing the NeuroScaffold.

What else did InVivo Management lose? Data from my historically significant primate studies for spinal cord injury? In 2017, InVivo still cannot locate the original primate study data processed 2008-2012.

**NVIV should not mislead investors based on mincing trademarked words.**

There are over 100 real people that know Frank Reynolds led the invention of the NeuroScaffold for Spinal cord injury so stop misleading with investors.

**We will increase our offer for InVivo Therapeutics to $100,000,000, but Richard Roberts and Ken DiPietro must resign from the Board of Directors and Mark Perin of course must resign.**

The real question is if they claim I'm not on patents: Are they so bad they couldn't lock up their founder and inventor, they should be replaced just for letting NVIV get this bad. Why didn't they get the founder on the invention documents? Why put out a statement that says the founder's not on patents, he's not signed over anything??...NOT BRIGHT, we all know to sign and lock up our stars.

The failure to conduct an exit interview resulted in lost IP to InVivo Therapeutics but that doesn't change the facts of reality that's recorded in 8 years of calendars, meetings minutes, and even an iPaq.

WE ALL KNOW, and Frank Reynolds knows who was the inventor on every NeuroScaffold patent call, and it was Frank Reynolds

[*Sic.*]

57. InVivo did not respond.

58. On January 23, 2017, however, the SEC halted trading in the securities of PixarBio, citing concerns about possible "manipulative or deceptive activities" in the market for the Company's stock. The SEC stated that it was halting trading "because the market for the security ***appears to reflect manipulative or deceptive activities*** and because of ***questions regarding the accuracy of assertions by PixarBio in press releases and its Form S-1 concerning, among other things: (1) the company's business combinations and current shareholders; (2) the identity and qualifications of key shareholders and employees; and (3) the company's current and prospective development efforts.***" (Emphasis added.) The Division of Enforcement of the SEC also issued subpoenas to PixarBio and Reynolds.

59. Also on January 23, 2017, Defendants abandoned their alleged attempt to acquire InVivo, stating in a press release that "[o]n behalf of the shareholders and Board of Directors of PixarBio we withdraw our offer for InVivo Therapeutics Corp for reasons related to management credibility and competence, corporate governance and IP control." It is not clear in the release who "we" referred to, since the Board of Directors of PixarBio is charged with managing the Company, and thus should be responsible for corporate decisions – not having them made on its behalf. In an extended statement entitled "PixarBio Terminates InVivo Therapeutics Bid Due To Founders IP Issues at InVivo," Defendants continued to dispute InVivo's response about its intellectual property:

> PixarBio has already beat InVivo Therapeutics in court on spinal cord injury non-compete allegations in 2015 [Plaintiffs have identified no court decisions finding for PixarBio against InVivo in 2015], so PixarBio will build on that win to proceed through the courts to engage Frank Reynolds NeuroScaffold IP ownership and bring his NeuroScaffold patent portfolio to PixarBio.
>
> **January 2017, the Month of Enlightenment on NVIV**
>
> Two weeks ago InVivo Therapeutics stated in a public message that InVivo Therapeutics and PixarBio Founder Frank Reynolds was not

on any NVIV NeuroScaffold patents. Crafty legaleaze maybe, but certainly misleading to Frank Reynolds family, his friends, his peer scientists, his peer engineers, his peer CFO's, his peer CEO's, to Wall Street, among others and that is misleading to the general public. How did Frank Reynolds names come off his patent portfolio?

"It's so misleading that the response is plain shock from my former peers at InVivo Therapeutics, whom I personally added to some of my patents and worked under my leadership on the Neuroscaffold invention" said PixarBio CEO and InVivo Therapeutics Founder Frank Reynolds

PixarBio now sees InVivo Therapeutics as a confused organization, unaware of their own history, and they are not worth pursuing at this time, until they can clear their Mgmt., BoD and IP issues.

**Three Reasons To Drop the NVIV Bid: Management Credibility, Corporate Governance, and IP Control**

**Management:** Current InVivo Therapeutics management appears to have little institutional knowledge of its own IP Portfolio. Failed IP knowledge transfer leaves current InVivo mgmt. unaware of well recorded Neuroscaffold invention facts backed by thousands of emails, and engagement with 100+ employees, consultants, advisors, patent agents and/or patent lawyers.

**Corporate Governance:** The new 2017 Board of Directors inherited a major problem and they know little about the facts, yet they have to resolve it, and throughout history missing key facts of invention usually doesn't bode well for defendants and for decision makers like the NVIV Board of Directors.

"No one in the right mind would challenge my inventorship, without some weird motive. What are their motives?" said PixarBio founder Frank Reynolds.

….

Since 2015, Blank Rome represents PixarBio for some IP work, involving CMCC/NVIV and NVIV has been losing IP rulings to Frank Reynolds since 2015 yet they seem surprised in January 2017 to see my name associated with the Neuroscaffold invention.

….

> In 2015, PixarBio Beat InVivo Therapeutics in a Non-Compete lawsuit In 2015, PixarBio beat InVivo in court on allegations of a non-compete for spinal cord injury inventions.

[*Sic.*]

60. This statement was false and misleading. Plaintiffs have been unable to identify any court decisions ruling for PixarBio against InVivo in 2015 in intellectual property disputes.

61. The SEC suspension rendered PixarBio's stock illiquid.

62. In January 2017, after Reynolds made his offer to buy InVivo, Criscione left the Company. Despite the fact that Criscione was PixarBio's Chief Technology Officer and, according to CW1, its primary scientist, the Company did not disclose his departure to investors. Some time later, however, Reynolds wrote an undated post on his personal website, www.frankreynolds.com, blaming Criscione for the SEC investigation of the Company:

> InVivo CEO Mark Perrin, former PixarBio CTO Jason Criscione, and David Kaplan former Pacira Pharmaceuticals Sales executive made up the three rotten legged stool, to try to steal PixarBio shareholders value by making false reports to the US SEC.
>
> ….
>
> I've focused this year to determine who was lying to the US SEC in late 2016 and early 2017 about PixarBio. It's taken us to September 2017 to see identify three defendants, but I will hold them ALL accountable for their actions.
>
> In recent weeks, I filed fraud claims against Jason Criscione PhD, and I are preparing Breach of Contract charges against Dr. Criscione.

63. Plaintiffs have not been able to identify any litigation or charges brought by Reynolds or PixarBio against Criscione.

64. Since the failed bid for InVivo and departure of Criscione, there is no evidence that PixarBio has engaged in any sort of scientific research and development. Indeed, despite raising over $7 million in the private placement it carried out before going public, the Company appears

to have run out of money. In March 2017, PixarBio stopped paying employees, including its controller, Mary Phelan. By June 14, 2017, the Company had reduced its full-time employees from 27 to 10 full-time employees and 1 part-time employee, and had left its headquarters in Medford, Massachusetts after its landlord commenced eviction proceedings. In an 8-K filed on June 16, 2017, PixarBio reported that it had only $71,800 cash on hand as of April 30, 2017, and an average monthly cash burn rate of approximately $450,000.

65. The Company also failed to file its annual report on Form 10-K for the year ended December 31, 2016 and its quarterly report on Form 10-Q for the first quarter of 2017 with the SEC.

66. PixarBio has continued to see the departures of directors and officers. Between December 17, 2017 and December 28, 2017, Derek S. Bridges, Katrin Holzhaus, and Laura Barker Morse, each either resigned or was ousted from PixarBio's board of directors. On March 6, 2017, PixarBio terminated Langer's consulting agreement and his position as a member of the Company's scientific advisory board.

67. Since the SEC suspension expired on February 3, 2017, the Company's stock's value has remained below $1 per share.

68. On February 21, 2018, PixarBio disclosed that on February 12, 2018, its counsel received notice that the staff of the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company.

69. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

70. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired PixarBio securities: (1) pursuant and/or traceable to the Private Placement; and/or (2) publicly traded during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

71. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PixarBio securities were actively traded on the OTC Marketplaces. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

72. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

73. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

74. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendant caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether the private placement memorandum was materially misleading;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of PixarBio securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

75. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

76. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- PixarBio securities were traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the OTC Marketplaces;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased and/or sold PixarBio securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

77. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

78. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

79. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

80. This Count is asserted against the Company and the Individual Defendant and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

81. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase PixarBio securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

82. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of PixarBio securities in an effort to maintain artificially high market prices for PixarBio securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

83. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PixarBio's financial well-being, business relationships, and prospects, as specified herein.

84. Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PixarBio's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about PixarBio and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of PixarBio securities during the Class Period.

85. Defendants acted with scienter in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the artificially inflated price of PixarBio securities.

86. Individual Defendant, who is the senior officer and/or director of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when he failed to ascertain and disclose the true facts in

the statements made by him or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

87. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of PixarBio securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of PixarBio securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities traded, and/or in the absence of material, adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired PixarBio securities during the Class Period at artificially high prices and were damaged thereby.

88. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

89. Had Plaintiffs and the other members of the Class been aware that the market price of PixarBio securities had been artificially and falsely inflated by the Company's and the Individual Defendant's misleading statements and by the material adverse information which the Company and the Individual Defendant did not disclose, they would not have purchased PixarBio securities at the artificially inflated prices that they did, or at all.

90. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of PixarBio securities during the Class Period, in an amount to be established at trial.

91. By reason of the foregoing, the Company and the Individual Defendant have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to

the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of PixarBio securities during the Class Period and/or pursuant and/or traceable to the Private Placement.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act Against The Individual Defendant**

92. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

93. During the Class Period, the Individual Defendant participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of his senior positions, he knew the adverse non-public information regarding the Company's business practices.

94. As officer and/or director of a publicly owned company, the Individual Defendant had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

95. Because of his positions of control and authority as senior officer, the Individual Defendant was able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period as well as the private placement memorandum. Throughout the Class Period, the Individual Defendant exercised his power and authority to cause the Company to engage in the wrongful acts and the scheme complained of herein. The Individual Defendant therefore, was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he

participated in the unlawful conduct and scheme alleged which artificially inflated the market price of PixarBio securities.

96. The Individual Defendant, therefore, acted as a controlling person of the Company. By reason of his senior management positions and/or being director of the Company, the Individual Defendant had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct and unlawful scheme complained of herein. The Individual Defendant exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

97. By reason of the above conduct, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: March 2, 2018

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: Laurence M. Rosen
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiffs*

**GAINEY MCKENNA & EGLESTON**

By: Thomas J. McKenna
Thomas J. McKenna (Admitted Pro Hac Vice)
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com

*Counsel for Named Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

Dated: March 2, 2018

*/s/ Laurence M. Rosen*

Laurence M. Rosen