**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com
***Counsel for Lead Plaintiffs***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARK ALLEN and SALVATORE RAPPA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>PIXARBIO CORPORATION f/k/a BMP HOLDINGS INC., FRANCIS M. REYNOLDS, KENNETH A. STROMSLAND, KATRIN HOLZHAUS, DAVID A. CASS, DEREK S. BRIDGES, and LAURA BARKER MORSE,<br><br>Defendants. | Case No: 2:17-cv-00496-CCC-SCM<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Mark Allen and Salvatore Rappa and Named Plaintiffs Marvin Becker and Jacqueline Becker ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' second amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PixarBio Corporation ("PixarBio" or the "Company"),

analysts' reports and advisories about the Company, a complaint against the Company by the SEC on April 24, 2018, a criminal complaint filed against Francis M. Reynolds ("Reynolds"), M. Jay Herod ("Herod"), and Kenneth Stromsland ("Stromsland") in the U.S. District Court for the District of Massachusetts on April 24, 2018, interviews with witnesses, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the securities of PixarBio: (1) in an offering carried out continuously beginning in December 2015; (2) pursuant and/or traceable to the Company's private placement that closed on October 30, 2016 (the "Private Placement"); and/or (3) publicly traded on the open market between October 31, 2016 and January 23, 2017, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. During the Class Period, Defendants repeatedly made false claims about PixarBio's operations and business plans in order to raise money from investors interested in financing research and development.

3. Then, in the beginning of 2017, the SEC brought the scheme to an end. On January 3, 2017, Defendants made what appeared to be an unserious offer to acquire InVivo Therapeutics ("InVivo"), a company previously run by Reynolds, for $77 million in stock – half of InVivo's market value at the time. On January 23, 2017, the SEC halted trading of PixarBio securities, citing

concerns about possible "manipulative or deceptive activities" in the market for the Company's stock.

4. These developments devastated the value of PixarBio's stock. On January 3, 2017, PixarBio's stock closed at $4.18 per share. Even after the SEC's January 23, 2017 suspension of trading expired on February 3, 2017, PixarBio's stock has consistently remained valued below $1 per share. Presently, the price of PixarBio stock is in the pennies per share. Then, on April 24, 2018, the SEC filed a complaint against the Company, Defendants Reynolds and Stromsland, and Herod (the "SEC Complaint")[1]. Defendants Reynolds and Stromsland were also arrested and charged with fraud, together with Herod.[2] The SEC Complaint is attached hereto as Exhibit A, and its allegations are incorporated herein by reference. The criminal complaint against Defendants Reynolds and Stromsland is attached hereto as Exhibit B, and its allegations are incorporated herein by reference.

## <u>JURISDICTION AND VENUE</u>

5. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and § 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

6. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and § 27 of the Exchange Act.

---

[1] *Securities and Exchange Commission v. PixarBio Corp., et al.*, Case No. 1:18-cv-10797 (D. Mass.).

[2] *United States of America v. Francis M. Reynolds, M. Jay Herod, Kenneth Stromsland*, Case No. 18-MJ-6151-MPK (D. Mass.).

7. Venue is proper in this district pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as Defendants conduct business and the Company maintains an office in this district.

8. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

9. Plaintiffs, as set forth in their certifications previously filed, purchased PixarBio securities at artificially inflated prices during the Class Period and/or pursuant and/or traceable to the Private Placement, and were damaged by Defendants' violation of the securities laws.

10. Defendant PixarBio is a specialty pharmaceutical/biotechnology company that claims to focus on the pre-clinical and clinical development of neurological drug delivery systems for post-operative pain. The Company is incorporated in Delaware and its principal executive offices are located at 8B Industrial Way, Salem, New Hampshire 03079. The Company also maintains offices at 2200 Fletcher Avenue, Suite 301, Fort Lee, NJ 07024. On October 31, 2016, PixarBio began publicly trading its stock on the OTC Markets under the stock symbol "PXRB." On November 8, 2016, PixarBio began trading its stock on the OTCQB Marketplace under the stock symbol "PXRB." On November 28, 2016, PixarBio began trading its stock on the OTCQX Marketplace under the stock symbol "PXRB."

11. Defendant Reynolds co-founded the predecessor corporation to what is now PixarBio in 2013. Reynolds is the Chairman, CEO, CFO, and Chief Scientific Officer of PixarBio.

12. Defendant Stromsland joined PixarBio in December 2015 as the Company's Chief Information Officer. In July 2016, Stromsland became PixarBio's Vice President of Investor and Public Relations.

13. Defendant Katrin Holzhaus ("Holzhaus") was a co-founder of the predecessor corporation to PixarBio, serving as Chief Administration Officer and a member of the Board of Directors from September 2013 until December 2017. As a member of the Company's management team as well as its Board, Holzhaus was deeply involved in PixarBio and in a position of control over its operations. Holzhaus previously worked with Reynolds at InVivo.

14. Defendant David Cass ("Cass") joined the Board of Directors of the predecessor corporation to PixarBio in June 2014 and continues to serve on the Board of PixarBio.

15. Defendant Derek Bridges ("Bridges") joined the Board of Directors of the predecessor corporation to PixarBio in February 2015. Bridges left the Board of PixarBio in December 2017.

16. Defendant Laura Barker Morse ("Morse") joined the Board of Directors of the predecessor corporation to PixarBio in June 2016. Morse left the Board of PixarBio in December 2017.

17. Defendants Reynolds, Stromsland, Holzhaus, Cass, Bridges, and Morse are sometimes referred to herein as the "Individual Defendants." The Individual Defendants:

(a) directly participated in the management of the Company;

(b) were directly involved in the day-to-day operations of the Company at the highest levels;

(c) were privy to confidential proprietary information concerning the Company and its business and operations;

(d) were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

18. The Company is liable for the acts of its predecessor companies, including but not limited to PixarBio Nevada as will be shown below.

19. The Company is also liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

20. The scienter of the Individual Defendant and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

21. The Company and the Individual Defendant are referred to herein, collectively, as "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

22. Defendant Reynolds co-founded InVivo in 2005, with proprietary technology developed by Robert S. Langer ("Langer"), a professor at the Massachusetts Institute of Technology ("MIT"). InVivo, which went public in 2010, focused (and continues to focus) on the

treatment of spinal cord injuries. Until August 2013, Reynolds was InVivo's Chairman, Chief Executive Officer, Chief Financial Officer, and President.

23. On August 22, 2013, InVivo announced that Reynolds had resigned from the company, effective immediately. At the time, Reynolds was a significant shareholder in InVivo. According to InVivo's Schedule 14A filed with the SEC on April 19, 2013, as of March 31, 2013, Reynolds held 21.5% of InVivo's outstanding common stock.

24. InVivo originally stated that Reynolds resigned due to a medical condition. The truth quickly proved to be quite different. In fact, InVivo's board of directors was investigating whether Reynolds had abused his position and misused corporate funds. The InVivo board of directors had convened a special meeting to consider whether Reynolds should be terminated before he resigned. In November 2013, InVivo sued Reynolds, claiming that between March 2011 and August 2013, he inappropriately charged over $500,000 of personal as well as exorbitant, and unreasonable expenses to the company. The lawsuit alleged breaches of fiduciary duties, breach of contract, conversion, misappropriation of corporate assets, unjust enrichment, and corporate waste. InVivo attached to its complaint a list of expenses that Reynolds charged to the company that included multiple personal vacations for himself, his girlfriends, and relatives, charges to his personal residential account at the Ritz Carlton in Boston, extensive entertainment expenses that had no business purpose, and personal goods. Reynolds soon filed counterclaims against InVivo alleging breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference with a contract.

25. Reynolds began selling off his InVivo stock daily. He accelerated these dispositions in August 2014, selling as many as 77,777 shares of InVivo stock each day and creating strong

downward pressure on InVivo's stock, which gradually dropped from $37.44 as of the first trading day of January 2014 to a then-all-time low of $8.04 on September 5, 2014.

26. Immediately after being forced out of InVivo, Reynolds founded PixarBio Corporation as a privately held Nevada corporation ("PixarBio Nevada"). According to a November 17, 2013 press release, PixarBio Nevada's founders included Reynolds, Langer, Randy Holmes-Farley, and Holzhaus. PixarBio Nevada planned to "research and develop novel biomaterials for long term-personalized drug delivery systems for Parkinson's Disease." On December 13, 2013, PixarBio Nevada announced that it had signed a five-year lease for a corporate headquarters and research and development facility in Medford, Massachusetts. PixarBio Nevada began describing Dr. Jason Criscione ("Criscione"), a biomedical engineer with experience in immunotherapy drug delivery and materials science who joined PixarBio Nevada in March 2014, as an additional co-founder of the company in approximately May 2015. Reynolds raised the seed capital for PixarBio Nevada primarily by selling some InVivo shares and raising a small amount from board members, family, and friends, including longtime friend Herod.

27. Reynolds continued carrying on a contentious relationship with InVivo as he was establishing PixarBio Nevada, including recruiting an InVivo employee to provide proprietary information for his new venture. On September 18, 2014, Yajing Hernandez ("Hernandez"), a research associate for InVivo, left her job at InVivo. Following Hernandez's last day of work, InVivo examined her laptop and allegedly discovered that she had transferred a significant volume of proprietary research materials to her personal email account. InVivo later learned that PixarBio Nevada allegedly lured Hernandez away with a $10,000 pay raise and stock options, and filed a complaint against her, PixarBio Nevada, and Reynolds.

28. According to its public statements, in 2015, PixarBio Nevada shifted its focus to non-opiate pain treatment.

29. On January 18, 2015, PixarBio Nevada entered into a consulting agreement with Langer, under which he received options to purchase 413,200 shares of PixarBio Nevada common stock at an exercise price of $.005 per share. There is no evidence, however, that Langer was meaningfully involved in any research and development work being carried out at PixarBio Nevada. David Kaplan ("Kaplan"), PixarBio's former chief commercial officer, later told a member of the Company's clinical advisory committee (Confidential Witness 1, or "CW1") that he himself had been misled about Langer's involvement. Kaplan told CW1 in a text message on January 13, 2017 that "I would not have invested had I known Langer's association was basically non-existent..... That along with naming him a co-founder lent tremendous credibility to Frank and that's confusing to everyone. I never once saw or had a conversation with Langer. I'm furious he gets an annual salary and was given 15% of the company. It was HIGHLY misleading."

30. On June 25, 2015, PixarBio Nevada announced in a press release that Criscione had been promoted to be the Company's Chief Technology Officer ("CTO"). In the same release, Criscione stated that PixarBio Nevada had "engineered several post-op/nerve block products while preparing for clinical studies expanding our non-opiate pain treatment pipeline."

31. On September 30, 2015, Reynolds and other PixarBio Nevada employees attended a "Pre-IND" meeting with FDA personnel to discuss the steps that the Company would have to take before it could submit an Investigational New Drug ("IND") application for permission to begin clinical testing of develop "NeuroRelease," a supposedly new method of delivering carbamazepine that could replace opioid pain relievers. According to the official FDA minutes of the meeting, which the U.S. Food and Drug Administration ("FDA") sent to Reynolds on October

29, 2015, at the meeting Reynolds argued that when PixarBio Nevada submitted an IND application, it should only have to submit six months of stability data, should not have to submit safety data concerning any anesthetic effect of NeuroRelease, and should be permitted to reduce its costs by submitting data from another company's nonclinical studies of carbamazepine. The FDA refused, insisting that PixarBio Nevada submit twelve months of stability data, submit safety data concerning any anesthetic effect of NeuroRelease, and could only use the other company's nonclinical data if it demonstrated that the other company's method of delivery of carbamazepine was sufficiently similar to the NeuroRelease method. The FDA also insisted that PixarBio Nevada conduct toxicology studies in two non-human species before beginning clinical studies on human subjects.

32. On October 26, 2015, PixarBio Nevada announced that it had filed an application with the FDA Office of Orphan Products Development, for orphan drug status for NeuroRelease for the treatment of trigeminal neuralgia.

33. From November 5, 2015 through December 4, 2015, PixarBio Nevada raised $718,000 from the sales of 1,107,009 shares of common stock at $0.649 per share, sold primarily to Reynolds.

34. In December 2015, PixarBio Nevada commenced a private offering, purportedly to accredited investors (the "Friends and Family Offering"). PixarBio Nevada's stated goal was to raise $3 million by selling 1 million shares at $3 per share. PixarBio Nevada solicited investment in the Friends and Family Offering through a December 11, 2015 offering letter, a presentation entitled "Novel Biomaterials for Neurological Delivery Systems Breakthrough Non-Opiate, Non-Addictive Pain Treatment" that set forth PixarBio Nevada's future plans, and a presentation

entitled “Friends & Family – Pre IPO Biomaterials for Neuroscience Non-Opiate; Non Addictive Pain Treatment” (together, the “Friends and Family Offering Materials”).

35. On February 2, 2016, Reynolds sent the FDA a letter agreeing with the agency’s comments as reflected in its minutes of the September 30, 2015 Pre-IND meeting. Since that letter, Defendants have not made any written submissions to the FDA regarding a possible IND application for the use of NeuroRelease to treat post-operative pain. While Reynolds requested another meeting with the FDA to discuss a possible IND application in February 2017, the agency denied his request.

36. On February 4, 2016, the FDA responded to PixarBio Nevada’s application for orphan drug status for NeuroRelease for the treatment of trigeminal neuralgia with a deficiency letter, stating, “You have not provided an adequate hypothesis of why your carbamazepine product is expected to be clinically superior by a measure of efficacy, safety or a major contribution to patient care overall carbamazepine products that are approved for use in treatment of trigeminal neuralgia.”

37. On February 22, 2016, PixarBio Nevada submitted an amended orphan drug status application, but on May 31, 2016, the FDA responded with another deficiency letter. Defendants have not taken any additional steps to pursue orphan drug designation for NeuroRelease for the treatment of trigeminal neuralgia.

38. On March 18, 2016, PixarBio Nevada announced that it had filed an application with the U.S. FDA Office of Orphan Products Development, for orphan drug status of NeuroRelease for the treatment of a form of spinal cord injury. The company had submitted the application to the FDA on February 2, 2016.

39. On May 24, 2016, however, the FDA sent PixarBio Nevada a deficiency later, stating, "You have not provided adequate scientific rationale to support orphan drug designation as you do not include a discussion of the scientific rationale to establish a medically plausible basis for the use of your proposed drug for the rare disease or condition." Defendants have not taken any additional steps to pursue orphan drug designation for NeuroRelease for the treatment of spinal cord injury.

40. By June 30, 2016, PixarBio Nevada had raised $5,398,980 and issued 3,718,130 shares of common stock related to the Friends and Family Offering. Throughout the Friends and Family Offering, Reynolds and Herod solicited investors in person, by phone, and by emailing, mailing, and posting on PixarBio Nevada's website materials written by Reynolds. These materials, including the Friends and Family Offering Materials as well as posts on PixarBio Nevada's website, claimed that the investors' funds would be used to develop NeuroRelease and move towards clinical testing.

41. By June 30, 2016, PixarBio Nevada had raised $5,398,980 and issued 3,718,130 shares of common stock related to the Friends and Family Offering.

42. As of June 30, 2016, PixarBio Nevada had an accumulated deficit of $14,610,582.

43. On July 22, 2016, Reynolds intensified his litigation against InVivo. He filed a lawsuit in New Hampshire against InVivo and certain members of its board alleging defamation, conspiracy, and tortious interference. Reynolds alleged that the InVivo defendants defamed Reynolds' reputation in the biotechnology and investment community, interfering with prospective investors in PixarBio Nevada.

44. On August 6, 2016, PixarBio Nevada announced a new private offering of up to 20,000,000 shares at the price of $2.00 per share (the "Private Securities Offering"). Each share

purchased received a warrant to purchase one share of common stock at an exercise price of $4.50 per share at any time over the next seven years. Defendants solicited investors for this offering using materials written by Reynolds, including an August 6, 2016 Private Placement Memorandum (the "PPM"), an August 2016 presentation entitled "Morphine Strength, Non-Opiate/Non-Opioid Non Addictive Pain Treatment … Novel Neurological Delivery Systems," an August 10, 2016 document entitled "Investor Update," an October 17, 2016 presentation entitled "PPM Offer Talking Points," and a series of press releases. PixarBio Nevada posted a link to the offering materials in press releases and on the company's website.

45. Almost immediately after launching the Private Placement, Reynolds began to take steps towards taking PixarBio Nevada public. On August 19, 2016, PixarBio Nevada purchased 96.7% of the stock of BMP Holdings Inc. ("BMP"), a Delaware corporation with a public listing on the OTC Markets exchange which operated a yoga business. The purchased stock was previously held by Henry Sargent ("Sargent"), who had been BMP's CEO, president, and sole director. As consideration, PixarBio Nevada paid Sargent $108,500 for his stock and made a capital contribution to BMP in the amount of $216,500, which was used to satisfy a personal loan that Sargent had made to BMP and to cover some remaining corporate expenses. As a result of this transaction, PixarBio Nevada became the majority shareholder of BMP, and Reynolds replaced Sargent as BMP's sole director. Effective September 28, 2016, BMP changed the trading symbol for its common stock on the OTC Markets from BMPP to PXRB. Between August 6, 2016 and October 31, 2016, PixarBio Nevada raised approximately $5.4 million from about 117 investors pursuant to the PPM.

46. In August 2016, PixarBio Nevada also amended the consulting agreement with Langer. Pursuant to an August 17, 2016 amendment to his consulting agreement, Langer would be

entitled to receive annual compensation of $200,000 beginning October 31, 2016, the effective date of the merger between BMP and PixarBio Nevada.

47. As of September 30, 2016, PixarBio Nevada had accumulated a $19,125,883 deficit.

48. On October 11, 2016, Reynolds, as the sole director of BMP, carried out a stock split, approving a stock dividend of nine shares of BMP common stock for each share issued and outstanding. This increased the number of BMP's issued and outstanding common stock to 51,680,000 from 5,168,000, with approximately 49,974,560 shares held by PixarBio Nevada.

49. On October 13, 2016, BMP formed PixarBio Acquisition Corp. ("PixarBio Acquisition"), a wholly-owned subsidiary incorporated in Nevada.

50. On October 28, 2016, BMP entered into an Agreement and Plan of Merger (the "Merger Agreement") with PixarBio Nevada and PixarBio Acquisition. Under the terms of the Merger Agreement, on October 31, 2016 – the day after PixarBio closed its private placement – PixarBio Acquisition was merged with and into PixarBio Nevada, with PixarBio Nevada continuing as the surviving corporation. BMP then effected a parent/subsidiary short-form merger with PixarBio Nevada, with BMP as the surviving corporation. Subsequently, BMP changed its name to "PixarBio Corporation," effective with FINRA on November 1, 2016. Through this series of transactions, the company that had started as PixarBio Nevada became the publicly traded PixarBio. PixarBio was, from its formation, listed on the OTC Markets exchange under the stock symbol "PXRB."

51. Immediately after these transactions, PixarBio's Board of Directors (the "Board") consisted of Reynolds, Holzhaus, Cass, Bridges, and Morse.

52. On October 31, 2016, PixarBio's stock opened trading at $3 per share. It closed at $4.77, and then quickly experienced large fluctuations.

53. On November 1, 2016, the Company's stock value fluctuated between $5.50 and $15 per share.

54. On November 2, 2016, it fluctuated between $11 and $30 per share, closing at $30. On November 3, 2016, it closed at $15 per share after fluctuating between $10 and $25.

55. On November 8, 2016, PixarBio began trading its stock on the OTCQB Marketplace under the stock symbol "PXRB." That day, the stock was valued at $14.25 per share.

56. On November 25, 2016, PixarBio filed a Form S-1 Registration Statement registering its common stock for resale (the "Registration Statement"), making available for resale up to 78,529,976 shares of its common stock and 4,001,767 shares of common stock issuable pursuant to warrants held by approximately 235 shareholders of record. The Registration Statement, however, proved to be materially false. Rather than using the funds raised by going public to fund PixarBio's operations, Reynolds was about to use his newly-public company to attempt to destabilize InVivo.

57. On November 28, 2016, PixarBio began trading its stock on the OTCQX Marketplace under the stock symbol "PXRB." The stock opened at $7.99 per share and closed at $6.80 per share.

58. After the SEC's Division of Corporate Finance gave Defendants several comments and raised several questions about the Registration Statement, the Company never responded, and never completed the registration process.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

59. Since the Company's unregistered securities offering began in December 2015, Defendants have made materially false and misleading statements in press releases, internet postings, emails, promotional materials, offering documents, and the Company's filings with the SEC.

**The Friends and Family Offering Materials**

60. In the December 11, 2015 letter to potential investors that served as the cover page for the Friends and Family Offering Materials, Defendants promised investors "a HUGE return on investment (ROI) for any investors in PixarBio's NeuroRelease." Reynolds told investors:

> "After we receive FDA approval between Q4:2017 and early 2018, thousands of years of morphine and opiate addiction will end for patients with access to NeuroRelease our Non-opiate, non-addictive pain treatment
>
> * * *
>
> The value of our portfolio on Wall Street is soaring with excitement around our sales partnership. At only $1,000,000,000 right now, as we prepare to replace morphine in the clinic in late 2017 or early 2018, and we expect our valuation to long-term trend UP." Reynolds further added that the "[f]orecasted financials are conservative."

In this letter, Reynolds also told investors that RSB, "our optimized R&D model," had developed "the cure for paralysis in humans."

61. Defendants knew or were reckless in not knowing that the claim that NeuroRelease would be approved by the FDA between the fourth quarter of 2017 and early 2018 was materially false and misleading. The Company had not even finished the pre-clinical work required to apply for permission to conduct human trials, commence manufacturing a product that could be used in humans, or started human clinical trials.

62. Defendants knew or were reckless in not knowing that the claim that PixarBio had a market value of one billion dollars was materially false and misleading. It certainly never had such a value.

63. Defendants knew or were reckless in not knowing that the claim that NeuroRelease would somehow end "thousands of years of morphine and opiate addiction" was materially false and misleading. NeuroRelease is a potential additional means of delivering carbamazepine via injection, in a time-release form. This same drug is already on the market in other forms, including time-release pills. Its depiction as somehow revolutionary was deceptive.

64. Defendants also knew or were reckless in not knowing that the claim that Reynolds had developed "the cure for paralysis in humans" was materially false and misleading. There has never been any evidence that he has done any such thing.

65. The Friends and Family Offering Materials also included a presentation entitled "Novel Biomaterials for Neurological Delivery Systems Breakthrough Non-Opiate, Non-Addictive Pain Treatment." The presentation stated:

> "Our September 30, 2015 meeting with the ***FDA lowered our hurdles*** for FDA approval and we're ready to transfer three pain treatments to the clinic for knee, hip, and shoulder pain . . . . Live US FDA [] meeting on September 30, 2015 ***confirmed our IND*** [Investigational New Drug] package and discuss[ed] our pathway to clinical studies in 2017 and approvals in early 2018."

[Emphasis added].

66. Defendants knew or were reckless in not knowing that those statements were materially false and misleading. In fact, the Company had not even submitted an IND package — the package of materials that must be approved by the FDA before starting human clinical trials. Moreover, the FDA had made clear at PixarBio Nevada's pre-IND meeting that the Company had

substantial work to do before it would be ready to submit such a package. The FDA did not "lower" any regulatory hurdles and did not "confirm" the Company's non-existent IND package.

67. This presentation also made other false and misleading claims about his purported achievements. For example, the presentation stated that Reynolds had attended "years of graduate school with formal training in Neuroscience, providing the foundation for his neuroscience expertise." In fact, although Reynolds claims to have received four masters degrees, none involved formal training in neuroscience. Similarly, Reynolds contended that he was "lead inventor" on the "NeuroScaffold" offered by his prior employer, InVivo, to treat acute spinal cord injuries. In fact, the NeuroScaffold was invented by Robert Langer, a professor at MIT, together with a neurosurgeon from Harvard Medical School. Reynolds also falsely stated that he founded PixarBio after his "retirement" from InVivo. In fact, Reynolds resigned from InVivo because he expected to be fired the next day as InVivo was investigating him for misconduct.

68. The Friends and Family Offering Materials also enclosed a presentation entitled presentation entitled "Friends & Family – Pre IPO Biomaterials for Neuroscience Non-Opiate; Non Addictive Pain Treatment." This presentation also included materially false and misleading statements.

69. First, in the presentation, Defendants misleadingly claimed again that they expected first FDA approvals in late 2017 and early 2018, and that the FDA had reduced hurdles for approval at the September 30, 2015 pre-IND meeting. It also repeated their false claims about Defendant Reynolds' background.

70. This presentation also stated with no support that out of 70 million annual surgeries performed in the United States, 42 million are "appropriate for NeuroRelease." Defendants knew or were reckless in not knowing that there was no medical or scientific evidence for this statement

whatsoever, and instead chose to use it to give investors a false picture of the potential market for their product.

71. On information and believe, the false claims in the Friends and Family Offering Materials were presented uniformly to investors, both in December 2015 and afterwards to new potential investors. Accordingly, even though Defendants Morse only joined PixarBio Nevada in June 2016, all of the Defendants were at different times responsible for the distribution of these materially false and misleading statements.

**The Private Securities Offering and Form S-1**

72. On or about August 22, 2016, Defendants issued a press release announcing that a private-securities offering underway at the time was "oversubscribed," and that the maximum offering amount would be increased from $20 million to $30 million. The press release stated in relevant part:

> **"PixarBio Corporation Announces the Opening of the Oversubscription of Stock Offering, and Extends Offering Close to September 9, 2016. The Stock Offering Will Fund Development of NeuroRelease™, a Morphine Replacement, Non-Opiate/Opioid, Non Addictive Pain Treatment**
>
> Cambridge, Massachusetts (August 22, 2016): PixarBio Corporation is pleased to announce the ***opening of the oversubscription*** of our private placement memorandum. In order to allow institutions to complete diligence, we are extending the closing date of the PPM to September 9, 2016. We expect to close the oversubscription up to $30,000,000 and to begin public trading the second week of September.
>
> PixarBio Corp the inventors of NeuroRelease™, a non-addictive morphine replacement for post-surgical pain treatment is in process of merging with a public entity. We expect PixarBio to begin trading on the OTC-QB during the second week of September. The use of the proceeds will be to build teams and facilities to conduct clinical studies, in order to maintain the momentum of the NeuroRelease™ Pain platform toward FDA approval in late 2018.
>
> "I've consistently outperformed hedge funds and we appreciate the continued support we are receiving from investors. Years ago our R&D team set the pace to lead the Pharma sector to develop a morphine replacement, and we've overachieved

> with NeuroRelease. We appreciate investor interest in our company" said PixarBio CEO Frank Reynolds. PixarBio Corporation's PPM Offering will raise between $20,000,000 and $30,000,000 through the issuance of 10,000,000 shares at $2.00 per share. The oversubscription maximum to $30,000,000 is now open and will also be raised at $2.00/share. In addition, a seven-year Warrant at $4.50 may raise an additional $45,000,000 over the next seven years."

[Emphasis added.]

73. In fact, as Defendants knew, the offering was not fully subscribed and had not raised even $10 million. *See* Exhibit B.

74. On or about October 20, 2016, Defendants issued a press release announcing that the maximum offering amount would be increased from $30 million to $40 million. The press release stated in relevant part:

> **"PixarBio Corporation, Expands PPM to $40,000,000, Extends PPM One Week to Close October 28, 2016 and Promotes Ken Stromsland to Vice President, CIO & External Communications**
>
> Cambridge, Massachusetts (October 20, 2016): PixarBio Corporation, inventors of NeuroReleaseTM, a novel morphine replacement, non-opiate/opioid, non-addictive pain treatment, is pleased to announce that due to oversubscription, we have increased our Private Placement Memorandum offering from $30,000,000 to $40,000,000, and in order to allow investor diligence we are extending the closing date of our private placement memorandum (PPM) to close on Friday October 28, 2016. We expect to finalize our merger with BMP Holdings on October 28, 2016 and for public trading of the new stock for PixarBio Corporation to begin the following week under the stock symbol PXRB.
>
> PixarBio Corporation is also pleased to announce the promotion of Ken Stromsland to Vice-President, CIO & External Communications. Ken has served as Chief Information Officer of PixarBio since December 2015, and he's enabled us to grow our geographic footprint while scaling personnel. In addition to his responsibility as the company CIO, for the last six months Ken has also lead investor and public relations. "These are the most exciting times of our careers and Ken has proven himself to be a key contributor in the executive suite, and that he can do both jobs, so he deserves both titles" said PixarBio CEO Frank Reynolds.
>
> Ken will continue to report to Frank Reynolds, the company's founder and Chief Executive Officer. In his ever expanding role Ken will lead the hiring of staff under his domain, as well as manage external relationships with investors, and communications partners. Ken will develop, and execute a globally integrated external communications plan that demonstrates PixarBio's revolutionary science

> and innovative culture. Responsibilities align to the company's growing leadership infrastructure, and in maintaining momentum toward the commercialization of NeuroRelease™, PixarBio's Morphine replacement, non-opiate/opioid, non-addictive pain treatment™, with expected FDA approvals in late 2018.
>
> "I met Ken over 14 years ago when we were students at The Wharton School: University of Pennsylvania. Ken's success in marketing, technology, and operations make him the perfect fit to add value to PixarBio. We have tapped into his talents and we are expanding his role in our company. As we prepare for public trading, in the next two weeks, Ken's role will be instrumental to PixarBio's long-term success" said PixarBio CEO Frank Reynolds."

75. Defendants knew or were reckless in not knowing that the offering had not raised even $10 million. *See* Exhibit B.

76. On or about November 7, 2016, Defendants issued a press release stating that the private offering announced in August 2016 "closed $7.2MM cash, $16.2MM in warrants, and we closed a $10MM line of credit to provide our runway with enough fuel through 2017." The press release stated in relevant part:

> **"PixarBio Corporation Closed Placement Offering Totaling $23.4MM, Plus a $10MM Line of Credit to Fund the Advancement of NeuroRelease**
>
> Cambridge, Massachusetts (November 7, 2016): PixarBio Corporation, (OTC: PXRB) inventors of NeuroReleaseTM, a novel morphine replacement, non-opiate/opioid, non-addictive pain treatment, today announced that it has completed the closing of the sale of common shares and warrants in a private placement transaction ("the Offering") ***resulting in expected proceeds of approximately $23.4 million from its private placement memorandum financing plus a $10MM line of credit. The PPM closed $7.2 million in cash, and warrants as exercised worth $16.2 million***.
>
> "Following my established Reynolds School of Business (RSB) model for Biotech/Pharmaceutical R&D, PixarBio has optimized our shareholder value through our recently closed private placement memorandum. I've raised over $100MM since 2008, and I have never closed a down round. In 2013, I left the company I founded InVivo Therapeutics with 1.5 years of cash, and two year of cash equivalents based on NVIV budgeted forecast. I left InVivo Therapeutics financially secure, and there's no reason to issue the first down round of my career with PixarBio Corp shares. Our PPM closed $7.2MM cash, $16.2MM in warrants, and we closed a $10MM line of credit to provide our runway with enough fuel through 2017. Replacing Morphine, and all opioids/opiates is one of the hottest

spaces for Pharma/Biotech investment right now, so we were able to optimize a balanced investment portfolio for investors. I've been researching and developing non-opiate pain treatments for a couple decades and now my inventions are an overnight hit. NeuroRelease is the only non-opiate, non-addictive morphine replacement engaging the US FDA, that is not neuro-toxic, and it's not cardio-toxic. NeuroRelease can be effective at fighting post-surgical pain for up to 14-days. I have predicted that in the future, our 14-Day post-surgical pain treatment will put struggling competitors with slowing year over year sales growth out of business within 36 months of NeuroRelease product launch. In the last year, our valuation has been outpacing the market and our competitors. We believe that we'll continue to outperform the market in regards to invention and shareholder value maximization. Discussions in recent months with strategic partners, gives us great confidence for maximizing shareholder value at PixarBio. I'm not an "annuity CEO/CFO" with less than 1% of their Pharma/Biotech shares, and seeking a steady paycheck. I own over 60% of PXRB and I will defend the shareholder value that I invent and capture for PixarBio shareholders. We have zero bad actors on our Board of Directors and we will fight to maximize shareholder value EVERYDAY," said PixarBio Chief Executive Officer Frank Reynolds.

The Company intends to use the net proceeds of the Offering to fund the clinical development of its lead product NeuroRelease™, a novel, non-addictive neurological drug delivery system for post-operative pain. The PPM sold 3.6 million shares issued at a price of $2.00 per share. Each common share will receive one warrant as part of the financing, which in aggregate represents 3.6 million warrants to purchase 3.6 million shares of PixarBio common stock. The warrants have a seven-year term and an exercise price equal to $4.50 per share, so the warrants are "in the money" now. The Company's Offering was made pursuant to Sections 4(a)(2), 4(a)(5), and/or Rule 506(b) of Regulation D promulgated under the Securities Act of 1933, as amended, and/or other applicable federal and state law exemptions from registration. The Offering closed on or about October 31, 2016, subject to customary closing conditions.

"We are delighted to announce that PixarBio began trading last week on the OTC Markets under stock symbol PXRB which will enable our shareholders to hold and trade our common stock on an accredited exchange. We view this as a significant step forward for the Company in advance of our application to list on the Nasdaq Stock Market. We view this as yet another important accomplishment in building a world-class Pharmaceutical and Biotech company," PixarBio CEO Frank Reynolds concluded."

[Emphasis added.]

77. Defendants knew or were reckless in not knowing that the Company did not have those funds actually closed and available and had raised only about $5 million in cash during that time period. *See* Exhibit B.

78. On November 25, 2016, the Company filed with the SEC the Registration Statement on Form S-1 to register 78,529,976 shares of common stock that the Company had previously issued to investors. Defendant Reynolds signed the Form S-1 as the Company's CEO.

79. The Form S-1 stated:

> "We participated in a face-to-face Pre-IND Meeting with the U.S. FDA on September 30, 2015 to discuss pre-clinical and clinical requirements of the NeuroRelease 14-day product, indicated for a nerve block, development program. The meeting minutes capture the required pre-clinical elements to support the clinical program. As a result of this meeting, we expect that clinical trials will begin in late 2017 and US FDA approvals for the NeuroRelease 14-day product are expected in 2018.
>
> Below is the "Forecasted US FDA 505(b)(2) Regulatory Path For NeuroRelease Pain", for which we plan first approvals occurring in 2018. However, the timelines are subject to uncertainties as to the pace and success of the clinical studies and the review of the US FDA, and there is no assurance that such approvals will be received.
>
> 2017 Build out cGMP Facility, Submit & Receive IND approval, initiate clinical studies
>
> 2018 Submit NDA to US FDA for 14-Day product, estimated US FDA approval for NeuroRelease 14-Day product
>
> 2019 Submit IND for NeuroRelease 3-Day "sprinkle on" product; submit IND for NeuroRelease 90-Day product
>
> 2020 Submit NDA to US FDA for NeuroRelease 3-Day "sprinkle on" product and NeuroRelease 90-Day product; estimated US FDA approval for NeuroRelease 3-Day "sprinkle on" product and NeuroRelease 90-Day product."

80. Defendants knew or were reckless in not knowing that those statements were materially false and misleading and that, given FDA requirements and necessary review time as

well as the FDA's feedback, it was highly unlikely that clinical trials could begin in late 2017 or that NeuroRelease would receive FDA approval in 2018. *See* Exhibit B.

**Claims About Acquiring InVivo**

81. On or about January 3, 2017, Defendants issued a press release announcing a purported bid to acquire InVivo, Defendant Reynolds' former employer. The press release, entitled "It's Time to Make US Pharma GREAT Again," stated in relevant part:

> **"It's Time to Make US Pharma GREAT Again, By Combining Two Frank Reynolds' Founded Pharmas, PixarBio Corp (OTCQX: PXRB) and InVivo Therapeutics (NASDAQ: NVIV). The $77,000,000 Stock Offer Will Create a New Pharma Called Reynolds Therapeutics Corporation to Solve the Opiate Crisis and To Regenerate Chronic Spinal Cord In Humans and Finally Cure Paralysis**
>
> Cambridge, Massachusetts (January 3, 2017): PixarBio Corporation, (OTCQX: PXRB) today announced a take-over bid to acquire InVivo Therapeutics the company PixarBio CEO Frank Reynolds founded in 2005. The deal is expected to close in Q1 2017.
>
> PixarBio Board of Directors has approved the offer, Board member Derek Bridges explained "As a Board, we're focused on responding to the opiate/opioid crisis with the development of NeuroRelease, and to solving Neurosciences biggest challenges in spinal cord injury, epilepsy, and Parkinson's disease. Our top priority is to replace Morphine, Percocet, Vicodin and other addictive opiates in the healthcare system. The threshold for US FDA approval for non-opiate post-surgical pain treatments is set low by Exparel, and will be easy to replace once NeuroRelease is FDA approved, which we expect in early 2019. In regards to neuro-trauma, we see great synergies for PXRB and NVIV shareholders combining both NVIV and PXRB patent portfolios. We'll rename PixarBio Corporation, Reynolds Therapeutics Corporation. Reynolds Therapeutics' R&D pipeline will be focused on developing breakthrough neurological treatments that will reduce costs all around the healthcare system. Reynolds Therapeutics will be a new type of Life Science Pharma focused on acute/chronic pain, acute/chronic spinal cord injury, adaptive technologies, epilepsy, and Parkinson's disease. Our portfolio will be FDA classified as either new drugs, new biologics, new devices and/or combo drug/device/biologics so the future is exciting for patients and we'll create a rare opportunity for investors interested in the future of non-addictive pain treatments and other challenging neurological conditions."
>
> **PXRB Value Proposition for NVIV Shareholder: Clear and Obvious**

- No more down rounds by NVIV CEO Mark Perrin
- **NVIV closed on 12/31/2016 at $4.20/share**
- NVIV began 2016 at $7.20/share
- **NVIV down ~46% in 2016, a continued spiral downward! PXRB can Stop it**
- NVIV stock is back near its 2010 IPO share price of $4.00/share (split-adjusted)
- NVIV has hit its 2010 IPO price of $4.00/share, TWICE since Frank Reynolds resigned, once in 2013 and here we are again near $4.00/share in 2017
- It's time for a change at NVIV, **Stop The NVIV downward spiral**
- **Valuable sustainable stock in a combined PXRB/NVIV called Reynolds Therapeutics Corporation**."

[Sic.]

82. Defendants knew or were reckless in not knowing that this apparent "offer" was not serious and was not "expected" to lead to a deal that would close. The Company did not have the capacity to offer $77,000,000 to acquire InVivo, and had no reasonable expectation of doing so, let alone closing such a transaction in the first quarter of 2017. The Company press release once again falsely described Reynolds as the primary inventor and patent holder of NeuroScaffold. *See* Exhibit B. Its statement that the "threshold for US FDA approval for non-opiate post-surgical pain treatments is set low by Exparel, and will be easy to replace once NeuroRelease is FDA approved, which we expect in early 2019," was also materially false and misleading. By this time, the Company had stopped even communicating with the FDA after receiving negative feedback multiple times.

83. On January 4, 2017, Defendants issued a second press release, which it filed with the SEC attached to a Form 8-K that Reynolds signed in his capacity as PixarBio's CEO. The press release stated in relevant part:

> **"PixarBio Corporation Responds to InVivo Therapeutics False Patent and Intellectual Property Claims**

Cambridge, Massachusetts (January 4, 2017): PixarBio Corporation, (OTCQX: PXRB) developers of NeuroReleaseTM, a morphine replacement, non-opiate/opioid, non-addictive pain treatment with FDA approval expected in early 2019, announced a response to InVivo Therapeutics press release dated January 3, 2017. The press release claims that, "InVivo has an exclusive license in the field of spinal cord injury to all patents and patent applications in prosecution covering the Neuro-Spinal Scaffold™. Frank Reynolds is not an inventor on any of these patents or patent applications, so no assignment is required and none was requested."

**The InVivo response is a Legal Play on Trademarks; Real Life Has Witnesses**

**Did InVivo Lose Records?**

Frank Reynolds filed over 40 patents applications at InVivo Therapeutics, capturing the Neuroscaffold in legal documents.

As the Founder of InVivo Therapeutics and the only employee of InVivo Therapeutics 2005-2008 he personally selected, hired, contracted, and paid with his own personal check to a few different patent law firms that filed his Neuroscaffold patents 2005-2008; and from Nov 2005 – August 2013 he was the ONLY scientist to attend every patent lawyer meeting for the InVivo NeuroScaffold. He was the only scientist in more than 80% of NeuroScaffold patents meetings from 2005-2013 totaling more than 200 NeuroScaffold patent meetings.

Frank Reynolds stated, "Today I had over 20 former staff jump to my defense and I know I can find 100+ lawyers, employees, consultants, advisors, that all lived through my Neuroscaffold invention with me, as I hired them all along the way. InVivo must have lost years of records."

**"Legal Play on words" or "Play on Trademarks" in the InVivo response**

Reynolds stated. "I own the trademark for Neuroscaffold, and when NVIV learned of the USPTO ruling, they realized I would not sign over the trademarks so InVivo created a new trademark "Neuro-Spinal Scaffold" and that trademark was indeed created after I left InVivo so I didn't invent anything under that moniker or the trademark "Neuro-Spinal Scaffold" but I certainly invented the NeuroScaffold for spinal cord injury at InVivo Therapeutics 2005-20013 about a decade before InVivo even thought up the moniker or trademark "Neuro-Spinal Scaffold". The new mgmt. team should have conducted an exit interview with me in 2013".

If InVivo doesn't have any record of my inventorship 2005-2013, they are worse off than anyone can imagine, because we had less than 8 employees until 2010 so who can they claim invented it? I spent 110 hours per week from 2005-2013 inventing the NeuroScaffold.

> What else did InVivo Management lose? Data from my historically significant primate studies for spinal cord injury? In 2017, InVivo still cannot locate the original primate study data processed 2008-2012.
>
> **NVIV should not mislead investors based on mincing trademarked words**.
>
> There are over 100 real people that know Frank Reynolds led the invention of the NeuroScaffold for Spinal cord injury so stop misleading with investors.
>
> **We will increase our offer for InVivo Therapeutics to $100,000,000, but Richard Roberts and Ken DiPietro must resign from the Board of Directors and Mark Perin of course must resign.**
>
> The real question is if they claim I'm not on patents: Are they so bad they couldn't lock up their founder and inventor, they should be replaced just for letting NVIV get this bad. Why didn't they get the founder on the invention documents? Why put out a statement that says the founder's not on patents, he's not signed over anything??…NOT BRIGHT, we all know to sign and lock up our stars.
>
> The failure to conduct an exit interview resulted in lost IP to InVivo Therapeutics but that doesn't change the facts of reality that's recorded in 8 years of calendars, meetings minutes, and even an iPaq.
>
> WE ALL KNOW, and Frank Reynolds knows who was the inventor on every NeuroScaffold patent call, and it was Frank Reynolds."

[Sic.] [Emphasis in original]

84. Defendants knew or were reckless in not knowing that the statements in the January 4, 2017 press release and Form 8-K were materially false and misleading as Reynolds had not invented the NeuroScaffold and that neither the Company nor Reynolds had the capacity to offer $100 million to acquire InVivo. *See* Exhibit B.

## <u>THE TRUTH PARTLY EMERGES WHILE DEFENDANTS CONTINUE TO LIE</u>

85. According to a lawsuit filed by Mary Phelan, the Company's former controller, the SEC commenced an investigation of the Company shortly after it began trading publicly.

86. Despite the pending investigation, on January 3, 2017, in a press release, Defendants announced an alleged take-over bid to acquire InVivo for $77 million in stock – half of InVivo's market value.

87. On December 30, 2017, the prior trading day, PixarBio's stock had closed at $4.59 per share, making its 78,529,976 issued and outstanding shares worth a total $360 million. In other words, taking PixarBio public had enabled Defendants to make this all-stock offer to purchase InVivo.

88. Defendants devoted much of the press release announcing PixarBio's bid for InVivo to criticizing InVivo's performance since Reynolds' departure:

> "It's been over 3.5 years since I resigned as CEO of InVivo Therapeutics Corporation, to found PixarBio Corporation (PXRB) in August 2013. It's clear that 2013-2017 have not been great years for the NVIV CEO & the NVIV Board of Directors. The round of recent MAJOR exits makes it a perfect time to keep the required exits for success going. It's time to focus on shareholder value, and REAL change at NVIV. I founded InVivo Therapeutics over 11 years ago but the last 3.5 years have been a black hole for investor's money, and the NVIV team has had a real dead spot in innovation failing in the area of shareholder value creation, so it's time for real Change", said PixarBio CEO Frank Reynolds.
>
> **NVIV Recent Exits in Q4 2016: Read the "Tea Leaves" of Change, Hopefully Not Finished**…
>
> - We've watched the NVIV legal team 2011-2016, Greenberg Traurig, replaced with Wilmer Hale…DONE
> - Since 2013, we've observed two NVIV CFOs replaced…we should know their exit deals…DONE
> - We've observed John McCarthy the Chairman of the Board of NVIV replaced…DONE
> - We've observed NVIV CEOs, guide the stock back to nears its 2010 IPO price $4.00/share twice since 2013…He Should Be DONE
> - We see Rich Roberts and Ken DiPietro still on the Board…value destroyers, whose own histories in our PXRB Board's opinion make them unfit for ANY public board so they must resign from the NVIV Board of Directors.

Will we see Dr Rich Roberts and Ken DiPietro resign next? NVIV shareholders must be dreaming as they read this thinking, a fresh start without Roberts and DiPietro…GRAND SLAM. LOVE THE NEW TEAM.

"We all know that NVIV current CEO Mark Perin's took his company before NVIV as CEO into bankruptcy, and Perin has had 3 years (maybe two years too long) that's enough time to succeed with a Frank Reynolds' Neuroscaffold technology so it's time for change. The CEO of NVIV needs to be replaced to have a shot at commercializing NVIVs true value, the NeuroScaffold for treating acute spinal cord injury invented by Frank Reynolds.", said PixarBio CEO Frank Reynolds

**NVIV MAJOR ISSUES**

- Terrible Stock Performance, Terrible CEO, and Terrible Board of Directors 2013-2017

- Without conducting an exit interview of NVIV Founder, NVIV primary NeuroScaffold inventor and patent holder Frank Reynolds, NVIV shareholders have struggled to maintain the $520,000,000 in value created by Frank Reynolds, and today at $136mm they are dreadfully overvalued.

- It took years for NVIV to notify Frank Reynolds of their patent assignment issue, and Frank Reynolds will not provide FREE patents to NVIV. That request was ridiculous.

- There's never been a bridge for NVIV shareholders to own the commercial rights to the original Neuroscaffold and Frank Reynolds and PXRB can provide that to NVIV shareholders.

- Merging PXRB and NVIV is the only pathway for NVIV shareholders to have commercial rights to all of Frank Reynolds Neuroscaffold patents, Pain, Epilepsy, and Parkinson's know-how which is a HUGE win for NVIV shareholders

- By combining the PXRB and NVIV patent portfolios under one roof, the world of Neuroscience will be changed forever with a steady stream of R&D portfolio growth 2017-2039 to replace addictive opiates treating post-surgical pain, with a wide range of acute and chronic pain treatments, to develop acute and chronic spinal cord injury treatments, and to develop epilepsy and Parkinson's disease treatments.

**NVIV Under Frank Reynolds' Inventions and Leadership 2005 -2013**

- NVIV Market Cap went from $00.00 in November 2005, to $520,000,000 in July 2013

- NVIV shares hit a high of $24.80/share (split-adjusted)

- NVIV had years of cash and equivalents when Frank Reynolds resigned

- Frank Reynolds conceived and patented The Neuroscaffold with his personal checks, lawyers and contracts

- Frank Reynolds invented a Thick R&D portfolio with 7 Products in the pipeline 2005 – 2013.

- Today Non-opiate pain replacements are the hottest space in medicine but NVIV missed it.

**NVIV After Frank Reynolds August 2013-2017**

- Stock Plummeted within 60 days of Frank's resignation, by Sept-Oct 2013, the Board and management of NVIV had one product in-process at the FDA, and the stock plummeted to near $4.00/sh. (split-adjusted), which was Frank Reynolds' NVIV 2010 IPO share price

- In August 2013, Frank Reynolds had two of his inventions in-process for US FDA approval, but the NVIV Board of independent Board members didn't know the R&D pipeline and killed off a thick R&D portfolio including novel, non-opiate pain treatments invented by Frank Reynolds.

- NVIV Missed the Non-opiate pain market

- On Dec 31, 2016 at $4.20 NVIV is back to near its 2010 IPO price of about $4.00 (split-adjusted) for the second time since 2010 after hitting $4.00 in 2013.

- The 2013 NVIV Board of Directors is being replaced, but not fast enough

**Is NVIV really worth $136,000,000?**

The PixarBio offering price for NVIV is discounted to $77,000,000, or a take-under price because NVIV has failed to protect the Neuroscaffold's value, and in 2017, it is now back to near Frank Reynolds' 2010 IPO price per share of $4.00 (split-adjusted).

NVIV is near the 2010 $4.00 IPO share price, for the second time in 3.5 years since Frank Reynolds resigned.

"It's time for me to take back the technology and re-value what I invented, and bring my neurological patent portfolio to market after merging PXRB with NVIV",

said PixarBio CEO, CFO, and Chief Science Officer Frank Reynolds. WE GOT THIS!!

* * *

**Justification for NVIV Take-under at $77,000,000**

- NVIV lacks Frank Reynolds Patent rights to commercialize the NeuroScaffold, the probability of a deal is zero under current Board of Directors and CEO

- Frank Reynolds has rejected NVIV request to assign rights to Neuroscaffold patent

- NVIV never compensated Frank Reynolds with shares for his inventions, and NVIV expects the use of the Neuroscaffold patents for free, but there will be a cost, and that cost must be factored into the current NVIV valuation, setting the new valuation around $77,000,000

- Since Reynolds resigned in 2013, NVIV CEOs twice have managed the stock down to Frank Reynolds' 2010 IPO price, CEO Mark Perrin has got to resign

- NVIV needs a CFO: Reynolds was finalist for CFO of the Year 2013. The temporary CFO brought in Q4 2016, has no EXPERIENCE as a public CFO, she is an internal hire with no leverage against the Board or leverage on Wall Street, so current NVIV valuation is way too high

- NVIV is back to its IPO again, A CFO MUST HAVE some Wall street exposure, this is NO TIME for training wheels

- PixarBio Founder Frank Reynolds not only won "2013 Boston Business Journal Finalist for CFO of the Year" but Frank Reynolds won the 2013 and 2016 Boston Business Journal Best Company to Work"

- During his career, Frank Reynolds is the ONLY CEO/CFO in Early Stage Pharma to have never done a down-round.

- Frank Reynolds education at Univ Penn: Wharton School, Harvard Business School, MIT-School, St Joe's Haub School of Business, Chestnut Hill College, and Temple Univ: Fox School of Business have provided him decades of more Wall Street experience than the Jan 2017 NVIV temporary CFO

- Frank Reynolds means a new life for NVIV shareholders

[Sic.]

89. Defendants knew or were reckless in not knowing that this announcement was false and misleading. PixarBio was not making a real offer to purchase InVivo. This offer was intended solely to disrupt InVivo and to allow Reynolds to publicly air his disputes with his former company.

90. InVivo quickly dismissed the offer as unserious, and disputed Defendants' statements about its intellectual property and patents. In a January 3, 2017 press release, InVivo stated:

> InVivo Therapeutics Corporation was not privy to the announcement made today and has not had any discussions with PixarBio Corporation nor any other party regarding this matter. Given that the nature of the offer is not credible, InVivo disclaims any obligation to make any additional public statements regarding this or similar proposed transactions from PixarBio.
>
> The PixarBio press release contained a number of unfounded statements that do not warrant a response. However, regarding the claims about patents and intellectual property, InVivo has an exclusive license in the field of spinal cord injury to all patents and patent applications in prosecution covering the Neuro-Spinal Scaffold™. Frank Reynolds is not an inventor on any of these patents or patent applications, so no assignment is required and none was requested.

91. In response, Defendants issued a press release that stated:

> "[InVivo's] press release claims that, "InVivo has an exclusive license in the field of spinal cord injury to all patents and patent applications in prosecution covering the Neuro-Spinal Scaffold™. Frank Reynolds is not an inventor on any of these patents or patent applications, so no assignment is required and none was requested."
>
> **The InVivo response is a Legal Play on Trademarks; Real Life Has Witnesses**
>
> **Did InVivo Lose Records?**
>
> Frank Reynolds filed over 40 patents applications at InVivo Therapeutics, capturing the Neuroscaffold in legal documents.
>
> As the Founder of InVivo Therapeutics and the only employee of InVivo Therapeutics 2005-2008 he personally selected, hired, contracted, and paid with his

own personal check to a few different patent law firms that filed his Neuroscaffold patents 2005-2008; and from Nov 2005 - August 2013 he was the ONLY scientist to attend every patent lawyer meeting for the InVivo NeuroScaffold. He was the only scientist in more than 80% of NeuroScaffold patents meetings from 2005-2013 totaling more than 200 NeuroScaffold patent meetings.

Frank Reynolds stated, "Today I had over 20 former staff jump to my defense and I know I can find 100+ lawyers, employees, consultants, advisors, that all lived through my Neuroscaffold invention with me, as I hired them all along the way. InVivo must have lost years of records."

**"Legal Play on words" or "Play on Trademarks" in the InVivo response**

Reynolds stated. "I own the trademark for Neuroscaffold, and when NVIV learned of the USPTO ruling, they realized I would not sign over the trademarks so InVivo created a new trademark "Neuro-Spinal Scaffold" and that trademark was indeed created after I left InVivo so I didn't invent anything under that moniker or the trademark "Neuro-Spinal Scaffold" but I certainly invented the NeuroScaffold for spinal cord injury at InVivo Therapeutics 2005-20013 about a decade before InVivo even thought up the moniker or trademark "Neuro-Spinal Scaffold". The new mgmt. team should have conducted an exit interview with me in 2013".

If InVivo doesn't have any record of my inventorship 2005-2013, they are worse off than anyone can imagine, because we had less than 8 employees until 2010 so who can they claim invented it? I spent 110 hours per week from 2005-2013 inventing the NeuroScaffold.

What else did InVivo Management lose? Data from my historically significant primate studies for spinal cord injury? In 2017, InVivo still cannot locate the original primate study data processed 2008-2012.

**NVIV should not mislead investors based on mincing trademarked words.**

There are over 100 real people that know Frank Reynolds led the invention of the NeuroScaffold for Spinal cord injury so stop misleading with investors.

**We will increase our offer for InVivo Therapeutics to $100,000,000, but Richard Roberts and Ken DiPietro must resign from the Board of Directors and Mark Perin of course must resign**.

The real question is if they claim I'm not on patents: Are they so bad they couldn't lock up their founder and inventor, they should be replaced just for letting NVIV get this bad. Why didn't they get the founder on the invention documents? Why put out a statement that says the founder's not on patents, he's not signed over anything?? […] NOT BRIGHT, we all know to sign and lock up our stars.

> The failure to conduct an exit interview resulted in lost IP to InVivo Therapeutics but that doesn't change the facts of reality that's recorded in 8 years of calendars, meetings minutes, and even an iPaq.
>
> WE ALL KNOW, and Frank Reynolds knows who was the inventor on every NeuroScaffold patent call, and it was Frank Reynolds."

[Sic.] [Emphasis in original.]

92. InVivo did not respond.

93. On January 23, 2017, however, the SEC halted trading in the securities of PixarBio, citing concerns about possible "manipulative or deceptive activities" in the market for the Company's stock. The SEC stated that it was halting trading "because the market for the security ***appears to reflect manipulative or deceptive activities and because of questions regarding the accuracy of assertions by PixarBio in press releases and its Form S-1 concerning, among other things: (1) the company's business combinations and current shareholders; (2) the identity and qualifications of key shareholders and employees; and (3) the company's current and prospective development efforts.***" (Emphasis added.) The Division of Enforcement of the SEC also issued subpoenas to PixarBio and Reynolds.

94. Also, on January 23, 2017, Defendants abandoned their alleged attempt to acquire InVivo, stating in a press release that "[o]n behalf of the shareholders and Board of Directors of PixarBio we withdraw our offer for InVivo Therapeutics Corp for reasons related to management credibility and competence, corporate governance and IP control."

95. In an extended statement entitled "PixarBio Terminates InVivo Therapeutics Bid Due To Founders IP Issues at InVivo," Defendants continued to dispute InVivo's response about its intellectual property:

> "PixarBio has already beat InVivo Therapeutics in court on spinal cord injury non-compete allegations in 2015 [Plaintiffs have identified no court decisions finding for PixarBio against InVivo in 2015], so PixarBio will build on that win to proceed

through the courts to engage Frank Reynolds NeuroScaffold IP ownership and bring his NeuroScaffold patent portfolio to PixarBio.

**January 2017, the Month of Enlightenment on NVIV**

Two weeks ago InVivo Therapeutics stated in a public message that InVivo Therapeutics and PixarBio Founder Frank Reynolds was not on any NVIV NeuroScaffold patents. Crafty legaleaze maybe, but certainly misleading to Frank Reynolds family, his friends, his peer scientists, his peer engineers, his peer CFO's, his peer CEO's, to Wall Street, among others and that is misleading to the general public. How did Frank Reynolds names come off his patent portfolio?

"It's so misleading that the response is plain shock from my former peers at InVivo Therapeutics, whom I personally added to some of my patents and worked under my leadership on the Neuroscaffold invention" said PixarBio CEO and InVivo Therapeutics Founder Frank Reynolds

PixarBio now sees InVivo Therapeutics as a confused organization, unaware of their own history, and they are not worth pursuing at this time, until they can clear their Mgmt., BoD and IP issues.

**Three Reasons To Drop the NVIV Bid: Management Credibility, Corporate Governance, and IP Control**

**Management:** Current InVivo Therapeutics management appears to have little institutional knowledge of its own IP Portfolio. Failed IP knowledge transfer leaves current InVivo mgmt. unaware of well recorded Neuroscaffold invention facts backed by thousands of emails, and engagement with 100+ employees, consultants, advisors, patent agents and/or patent lawyers.

**Corporate Governance:** The new 2017 Board of Directors inherited a major problem and they know little about the facts, yet they have to resolve it, and throughout history missing key facts of invention usually doesn't bode well for defendants and for decision makers like the NVIV Board of Directors.

"No one in the right mind would challenge my inventorship, without some weird motive. What are their motives?" said PixarBio founder Frank Reynolds.

* * *

Since 2015, Blank Rome represents PixarBio for some IP work, involving CMCC/NVIV and NVIV has been losing IP rulings to Frank Reynolds since 2015 yet they seem surprised in January 2017 to see my name associated with the Neuroscaffold invention.

* * *

> In 2015, PixarBio beat InVivo in court on allegations of a non-compete for spinal cord injury inventions."

[Sic.]

96. This statement was false and misleading. Plaintiffs have been unable to identify any court decisions ruling for PixarBio against InVivo in 2015 in intellectual property disputes.

97. The SEC suspension rendered PixarBio's stock illiquid.

98. In January 2017, after Defendants made their offer to buy InVivo, Criscione (PixarBio's CTO) left the Company. Despite the fact that Criscione was PixarBio's Chief Technology Officer and, according to CW1, its primary scientist, Defendants did not disclose his departure to investors. Sometime later, however, Reynolds wrote an undated post on his personal website, www.frankreynolds.com, blaming Criscione for the SEC investigation of the Company, stating in relevant part:

> "InVivo CEO Mark Perrin, former PixarBio CTO Jason Criscione, and David Kaplan former Pacira Pharmaceuticals Sales executive made up the three rotten legged stool, to try to steal PixarBio shareholders value by making false reports to the US SEC.
>
> * * *
>
> I've focused this year to determine who was lying to the US SEC in late 2016 and early 2017 about PixarBio. It's taken us to September 2017 to see identify three defendants, but I will hold them ALL accountable for their actions.
>
> In recent weeks, I filed fraud claims against Jason Criscione PhD, and I are [sic] preparing Breach of Contract charges against Dr. Criscione."

99. Plaintiffs have not been able to identify any litigation or charges brought by Reynolds or PixarBio against Criscione.

100. Since the failed bid for InVivo and departure of Criscione, there is no evidence that PixarBio has engaged in any sort of scientific research and development. Indeed, despite raising

over $7 million in the private placement it carried out before going public, the Company appears to have run out of money. In March 2017, PixarBio stopped paying employees, including its controller, Mary Phelan.[3] By June 14, 2017, the Company had reduced its full-time employees from 27 to 10 full-time employees and 1 part-time employee, and had left its headquarters in Medford, Massachusetts after its landlord commenced eviction proceedings. In a Form 8-K filed with the SEC on June 16, 2017, PixarBio reported that it had only $71,800 cash on hand as of April 30, 2017, and an average monthly cash burn rate of approximately $450,000.

101. The Company also failed to timely file with the SEC its annual report on Form 10-K for the year ended December 31, 2016 and has failed to file said Form 10-K to date nor has it filed with the SEC any subsequently due Form 10-Qs.

102. Since the SEC suspension expired on February 3, 2017, the Company's stock's value has remained below $1 per share and now is listed at pennies per share.

103. On February 21, 2018, PixarBio disclosed that on February 12, 2018, its counsel received notice that the staff of the SEC made a preliminary determination to recommend that the SEC file an enforcement action against the Company.

104. On April 24, 2018, the SEC commenced an action against PixarBio, and Reynolds, Stromsland, and Herod were arrested and charged with fraud. *See* Exhibit A and Exhibit B.

[3] On September 12, 2017, Mary Phelan, a former employee of the Company, commenced a legal proceeding in Massachusetts through her attorneys against the Company for $82,909 in unpaid wages. Ms. Phelan had served as the Company's Controller from January 2016 until May 22, 2017, when she was terminated. Ms. Phelan asserted that the Company ceased paying her in March 2017 and that she has not received her salary which was due to her. The Company reached an agreement with the New Jersey Department of Labor to settle Ms. Phelan's claims by agreeing to make a series of payments in full satisfaction of a similar claim.

105. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**SCHEME TO PROFIT FROM IMPROPER PUBLIC SALES OF PIXARBIO STOCK**

106. According to the SEC's investigation, in the summer of 2016, Reynolds engineered a scheme to initiate – and profit from – public trading in PixarBio stock while evading the registration requirements of the federal securities laws. The scheme rested on PixarBio's acquisition of BMP, which was essentially a shell company. BMP's only business activity was a small yoga studio that consistently lost money.

107. BMP had been created in 2015 by the in-house lawyer at a Connecticut financial services firm. The Connecticut lawyer had recruited thirty-two people (family members, employees of his firm, friends, and business contacts) to buy 168,000 shares of BMP common stock for 1¢ per share. He had then caused BMP to file with the SEC a Form S-1 registration statement seeking to register the sale of the 168,000 shares held by the thirty-two shareholders. In doing so, the lawyer concealed his relationship with the nominally "outside" BMP shareholders, all of whom were prepared to act at his direction regarding when and how to dispose of their BMP stock. On August 12, 2015, BMP's Form S-1 registration statement was declared effective by the SEC, which meant that the 168,000 shares of BMP stock were available to be bought and sold on the over-the-counter market. However, because the registration was fraudulently obtained, and because the thirty-two BMP shareholders were effectively controlled by the Connecticut lawyer,

who was an affiliate of BMP,[4] the 168,000 ostensibly registered shares of BMP stock actually remained restricted shares that could not legally be sold to the public without a valid registration.

108. Reynolds arranged for PixarBio to acquire the Connecticut lawyer's controlling interest in BMP. To further his scheme for another unregistered offering, Reynolds also proposed that the Connecticut lawyer arrange for the thirty-two BMP shareholders to transfer their 168,000 purportedly unrestricted shares of BMP stock to people whom Reynolds or the lawyer could control.

109. On August 18, 2016, Reynolds caused PixarBio to pay $325,000 for the Connecticut lawyer's controlling interest in BMP (which consisted of 5 million restricted shares that had not been registered).

110. On August 23, 2016, at Reynolds's direction, Herod (a long-time friend of Reynolds) bought 130,000 shares of BMP stock from twenty-five of the shareholders for $2,600 (or 2¢ per share) in a single transaction arranged by the Connecticut lawyer. The lawyer and a consultant hired by PixarBio bought the other 38,000 BMP shares.

111. On October 11, 2016, Reynolds caused BMP (now a subsidiary of PixarBio) to announce a stock dividend of nine shares for each share outstanding. As a result of the stock dividend, the 168,000 purportedly unrestricted shares of BMP stock became 1,680,000 shares, of which Herod owned 1.3 million shares.

112. On October 11, 2016 (the same day that BMP announced the stock dividend), Reynolds directed Herod to deposit his shares of BMP stock at a brokerage firm that Reynolds had previously used to unload over-the-counter securities. When Herod opened the account and

[4] Rule 405 [17 C.F.R. §230.405] defines an "affiliate" of a specified person as "a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified."

deposited his BMP shares, he told the brokerage firm that he had no relationship with BMP and was not an affiliate of PixarBio. Herod provided the brokerage firm with a letter from Reynolds stating that Herod's BMP shares were freely tradeable. Herod also submitted an opinion letter, which Reynolds had obtained from PixarBio's outside law firm, stating that his BMP shares were freely tradeable. Reynolds knew or was reckless in not knowing that the representations to the brokerage firm were materially false and misleading. Although apparently registered, Herod's shares of BMP stock were restricted when he bought them, because the twenty-five people who sold the shares to Herod acted at the direction of the Connecticut lawyer and were thus affiliates of the lawyer himself and affiliates of BMP. The shares remained restricted after Herod bought them. By acting as directed by Reynolds, Herod was an affiliate of Reynolds, which made Herod an affiliate of PixarBio (BMP's parent corporation), which in turn made Herod an affiliate of BMP.

113. On October 30, 2016, Reynolds caused PixarBio to effect a reverse merger into BMP, which changed its name to "PixarBio." As a result of the reverse merger and name change, the outstanding shares of BMP stock became shares of PixarBio stock, of which Herod owned 1.3 million shares. Although nominally registered, Herod's shares of PixarBio stock were not legally tradeable, because Herod was an affiliate of Reynolds and thus an affiliate of PixarBio.

114. As of October 31, 2016, the common stock of the new PixarBio entity was quoted and traded on the over-the-counter market under the symbol "PXRB." PixarBio stock opened for public trading at $3 per share.

115. On October 31 and November 1, 2016, Herod sold approximately 70,000 shares of PixarBio stock for approximately $320,000. However, the stock price rose so fast over the next few days (reaching $30 per share on November 2) that his brokerage firm suspended his trading. To find a different firm that would let Herod sell his PixarBio shares, Reynolds and Herod made

materially false and misleading statements to two other brokerage firms. Herod told one firm, "I am not affiliated in any way, shape or form" with PixarBio. Reynolds wrote to another firm, "M. Jay Herod has never been an officer or an affiliate of PixarBio Corporation in our history." On November 21, 2016, one of the firms allowed Herod to deposit his shares and resume his trading in PixarBio stock.

116. Between October 31, 2016 and January 20, 2017, Herod sold a total of 211,901 shares of PixarBio stock to the public for approximately $910,000, of which Herod paid $500,000 to PixarBio and $300,000 to Reynolds. Herod kept the remaining net sale proceeds for himself. Because Herod was an affiliate of PixarBio, his sales of shares of PixarBio stock to the public should have been registered.

**SCHEME TO MANIPULATE THE PUBLIC MARKET FOR PIXARBIO STOCK**

117. According to the SEC Complaint (attached hereto as Exhibit B), when public trading on the over-the-counter market began on October 31, 2016, Reynolds and Stromsland carefully monitored public trading in PixarBio stock. Stromsland's standard practice was to open the OTC website on one of his office computers, monitor trading activity throughout the day, and provide Reynolds with regular updates about the trading price and volume.

118. Between November 2016 and January 2017, Stromsland made manipulative trades in PixarBio stock for the purpose of creating a false or misleading appearance of active trading in the public market for PixarBio stock. The manipulative trading included overlapping orders to buy and sell PixarBio stock at the same price ("wash trades"), purchases shortly before trading closed at 4:00 p.m. ("marking the close"), and purchases above the current asking price. The following paragraphs detail some examples of manipulative trading by Stromsland and Herod.

119. According to the SEC Complaint, on November 11, 2016, the trading price of PixarBio stock on OTC Link fell from $14.50 to $10 per share. At 3:05 p.m., Stromsland called his broker and bought 100 shares at $14.25 per share. While still on the phone with the broker, Stromsland checked the OTC website and did not see any record of his purchase at $14.25 per share. He asked the broker, "How come . . . the last price still says $10." The broker explained that Stromsland's purchase had been marked out of sequence on OTC. Stromsland said, "Yeah, but I need it to be in sequence" and "yeah, but that's not what I wanted . . . . So anybody looking to buy this now just sees $10 and doesn't know that it's $14.25 is the last trade." He asked "Is there any way to fix it?" He then called OTC Markets, but his purchase at $14.25 per share still did not appear on the public OTC website. At 3:42 p.m., Stromsland called his broker again and said, "I need to buy 100 shares at $14.25 of PXRB […] real quick […] right now." Stromsland's second purchase at $14.25 per share was executed at 3:55 p.m. – five minutes before the close of trading. Stromsland and Reynolds exchanged at least eight phone calls on November 11, 2016, including calls just minutes before and minutes after Stromsland's calls to his broker and to OTC Markets. Stromsland called Reynolds one minute after trading ended at 4:00 p.m., and they exchanged three calls before 4:30 p.m. At 4:40 p.m., Reynolds emailed PixarBio's controller, telling her that Stromsland was entitled to a $27,500 "bonus".

120. On November 17, 2016, with the trading price of PixarBio stock once again down to $10 per share, Stromsland bought 100 shares at $12.50 per share at 3:56 p.m. – four minutes before the close of trading.

121. On November 25, 2016, PixarBio stock closed at $8.00 per share. On November 28, 2016 (the next trading day), the price began to fall. At 2:25 p.m., Herod placed an order to sell 300 shares at $6.80 per share. The sell order was immediately filled for 147 shares, leaving 153

shares unsold. At 3:49 p.m., Stromsland called his broker and placed an order to buy Herod's remaining 153 shares at the $6.80 asking price. The transaction between Herod and Stromsland was executed at 3:53 p.m. – seven minutes before the close of trading.

122. Between November 22 and December 2, 2016, the closing price of PixarBio stock dropped from $10.05 to $5.50 per share. On December 5, 2016 (the next trading day), the opening offer to sell was at $5.44 per share. Herod made the first three purchases of the day and pushed the price up to $5.60 per share. In the second and third trades, Herod bought 100 shares from himself, filling orders to sell that he had placed less than six minutes earlier. After these transactions, Herod was able to sell over 4,500 shares at $5.60, including 3,568 to one retail investor for almost $20,000. Soon after, Herod bought 100 shares from himself once again, this time at $5.70 per share.

123. On December 6, 2016, Herod engaged in one wash trade and placed two 100-share orders to buy that caused the current bid price reported on OTC Link to rise nearly 20% (from $4.75 to $5.60 per share, and later from $4.75 to $5.65 per share).

124. On December 19, 2016, Herod submitted two orders to buy PixarBio stock at prices higher than his own pending orders to sell. His second order to buy (at $5.14 per share) was 39¢ more than the price he received from a sale just two minutes earlier.

125. On December 20, 2016, PixarBio stock opened trading above $5 per share, but within three hours, the stock was trading at $4 per share, its lowest level since public trading began on October 31, 2016. Herod and Stromsland both stepped in and placed buy orders that moved the price of PixarBio stock above $4 per share. At one point, Herod submitted orders to buy 100 shares at $5 per share and sell 100 shares at $5 per share only one minute apart. Less than an hour later, after the price had fallen below $4 per share, Herod placed an order to buy 100 shares at $4.50 per

share. The stock price rebounded within minutes of Herod's purchase and ultimately ended the day's trading at $5.25 per share.

126. Between October 31, 2016 and January 20, 2017, the period in which Herod sold a total of 211,901 shares of PixarBio stock to the public, he also bought a total of 6,618 shares, often in wash trades and often at higher prices than his own pending orders to sell. There was no bona fide reason for Herod's purchases. Instead, Herod was trying to fend off the decline of PixarBio's stock price by using small purchases to manipulate the reported price and volume of PixarBio stock trading.

127. On January 23, 2017, the SEC suspended public trading in PixarBio stock pursuant to its authority under Section 12(k) of the Exchange Act [15 U.S.C. §78l(k)]. Among other things, the SEC's order stated:

> "The Commission temporarily suspended trading in the securities of PixarBio because the market for the security appears to reflect manipulative or deceptive activities and because of questions regarding the accuracy of assertions by PixarBio in press releases and its [November 25, 2016] Form S-1 concerning, among other things: (1) the company's business combinations and current shareholders; (2) the identity and qualifications of key shareholders and employees; and (3) the company's current and prospective development efforts."

128. Since January 23, 2017, sporadic trading in PixarBio stock has taken place on what is called the "grey market," which refers to trades in securities that are not publicly quoted on the over-the-counter market or listed on an exchange.

**ATTEMPTS BY REYNOLDS TO**
**<u>OBSTRUCT THE SEC'S INVESTIGATION</u>**

129. According to the SEC Complaint, on January 26, 2017, Reynolds testified under oath as part of the SEC's investigation. When the SEC staff asked about a $300,000 check that Reynolds's wife had received from Herod, Reynolds testified that the money was a loan from Herod so that Reynolds could pay outstanding legal bills for his ongoing lawsuit against InVivo.

Reynolds testified that there was no documentation for the loan, nor any agreement about repayment terms.

130. On February 8, 2017, Herod testified under oath as part of the SEC's investigation. Herod produced a document that purported to be a letter from Reynolds and Reynold's wife dated December 29, 2016 stating that Herod was paying $300,000 to the Reynoldses in exchange for a 10% interest in any amount that Reynolds received through a settlement of his counterclaims in the InVivo litigation.

131. On September 19, 2017, at a second day of investigative testimony, Reynolds testified that the letter which Herod had produced was genuine, and that Reynolds, Reynolds's wife, and Herod had signed the letter on December 29, 2016. Reynolds could not explain why he testified that no such documentation existed when he was questioned on January 26, 2017 (less than one month after the date of the purported letter).

132. The purported December 29, 2016 letter was not genuine. It was a fabrication that Reynolds arranged to prepare after his first day of testimony in order to mislead the SEC's investigators.

133. Reynolds and Herod also testified falsely about the supposed reason why Herod had made the $300,000 check payable to Reynolds's wife, rather than payable to Reynolds personally. They each claimed that Reynolds was out of town on the day Herod wrote the check. That was not true. In reality, Herod and Reynolds met in person on December 29, 2016, and they arranged for Herod to write the check to Reynolds's wife in an effort to cover up the transaction.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

134. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise

acquired PixarBio securities: (1) pursuant and/or traceable to the Private Placement; and/or (2) publicly traded during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

135. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PixarBio securities were actively traded on the OTC Marketplaces. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

136. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

137. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

138. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company

(c) whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendant caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether the private placement memorandum was materially misleading;

(f) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(g) whether the prices of PixarBio securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(h) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

139. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

140. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) PixarBio securities were traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the OTC Marketplaces;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(g) Plaintiffs and members of the Class purchased and/or sold PixarBio securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

141. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

142. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act**
**<u>and Rule 10b-5 Against All Defendants</u>**

143. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

144. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

145. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase PixarBio Nevada securities (which became PixarBio securities) and PixarBio securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

146. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of PixarBio Nevada securities (which became PixarBio securities) and PixarBio securities in an effort to maintain artificially high market prices for PixarBio securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

147. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the financial well-being, business relationships, and prospects of PixarBio Nevada and PixarBio, as specified herein.

148. Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the value and performance and continued substantial growth of PixarBio and PixarBio Nevada, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about PixarBio and PixarBio Nevada and their business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of PixarBio and PixarBio Nevada securities during the Class Period.

149. Defendants acted with scienter in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the artificially inflated price of PixarBio securities.

150. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose

the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

151. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of PixarBio securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of PixarBio securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities traded, and/or in the absence of material, adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired PixarBio and PixarBio Nevada securities during the Class Period at artificially high prices and were damaged thereby.

152. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

153. Had Plaintiffs and the other members of the Class been aware that the market price of these securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased securities at the artificially inflated prices that they did, or at all.

154. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of PixarBio and PixarBio Nevada securities (which became PixarBio securities) during the Class Period, in an amount to be established at trial.

155. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

156. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

157. During the Class Period, the Individual Defendants each participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, the Individual Defendants knew the adverse non-public information regarding the Company's business practices.

158. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

159. Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period as well as the private placement memorandum. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts and the scheme complained of herein. The Individual Defendants

therefore, were each a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, each participated in the unlawful conduct and scheme alleged which artificially inflated the market price of PixarBio securities.

160. The Individual Defendants, therefore, each acted as a controlling person of the Company. By reason of their positions as senior officers and/or directors of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct and unlawful scheme complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

161. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**COUNT III**

**(For Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5(a) & (c) Against All Defendants)**

162. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

163. During the Class Period, Defendants violated Rules 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of PixarBio securities and PixarBio Nevada securities (which became PixarBio securities) during the Class Period as alleged herein.

164. To state a claim for scheme liability, a plaintiff must present facts showing (a) that the defendant committed a deceptive or manipulative act, (b) in furtherance of the alleged scheme to defraud, (c) with scienter, and (d) reliance.

165. Scheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement.

166. A plaintiff may raise a strong inference of a corporate entity defendant's knowing involvement in an illegal scheme by pleading the necessary facts against an individual corporate officer whose intent can be imputed to the corporate entity.

167. PixarBio is liable under Rule 10b-5(a) and (c) because: (a) several high-ranking directors and officers of PixarBio undertook a deceptive course of conduct by actively participating in the above-described fraud and the conduct was not done in their own personal interest; (b) the evidence demonstrates that these high-ranking directors and officers of PixarBio knew that the fraud was taking place; (c) the fraud caused the price of PixarBio stock to be artificially inflated; (d) when the fraud was disclosed, the price of PixarBio stock dropped significantly, causing harm to Plaintiffs and the putative class; and (e) PixarBio benefitted from the fraud.

168. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for PixarBio securities. Plaintiffs and the Class would not have purchased securities at the prices they paid, or at all, had they been aware that the market prices for the securities had been artificially inflated by Defendants' scheme.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: July 23, 2018

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: <u>*Laurence M. Rosen*</u>
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

***Counsel for Lead Plaintiffs***

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna (*Admitted Pro Hac Vice*)
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com

***Counsel for Named Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

Dated: July 23, 2018

*/s/ Laurence M. Rosen*
Laurence M. Rosen